## MISHKIN v. NEW YORK.

No. 49. Argued December 7, 1965.—Decided March 21, 1966.

*Emanuel Redfield* argued the cause and filed a brief for appellant.

*H. Richard Uviller* argued the cause for appellee. With him on the brief were *Frank S. Hogan* and *Alan F. Leibowitz.*

*Edward de Grazia* filed a brief for Marshall Cohen et al., as *amici curiae,* urging reversal.

Briefs of *amici curiae,* urging affirmance, were filed by *Leo A. Larkin, Roger Arnebergh* and *Max P. Zall* for the City of New York et al.; and by *Charles H. Keating, Jr.,* and *James J. Clancy* for Citizens for Decent Literature, Inc., et al.

MR. JUSTICE BRENNAN delivered the opinion of the Court.

This case, like *Ginzburg* v. *United States, ante,* p. 463, also decided today, involves convictions under a criminal obscenity statute. A panel of three judges of the Court of Special Sessions of the City of New York found appellant guilty of violating § 1141 of the New York Penal Law [1] by hiring others to prepare obscene books, publishing obscene books, and possessing obscene books with intent to sell them.[2] 26 Misc. 2d 152, 207 N. Y. S. 2d 390

---

[1] Section 1141 of the Penal Law, in pertinent part, reads as follows:

"1. A person who . . . has in his possession with intent to sell, lend, distribute . . . any obscene, lewd, lascivious, filthy, indecent, sadistic, masochistic or disgusting book . . . or who . . . prints, utters, publishes, or in any manner manufactures, or prepares any such book . . . or who

"2. In any manner, hires, employs, uses or permits any person to do or assist in doing any act or thing mentioned in this section, or any of them,

"Is guilty of a misdemeanor . . . .

.        .        .        .        .

"4. The possession by any person of six or more identical or similar articles coming within the provisions of subdivision one of this section is presumptive evidence of a violation of this section.

"5. The publication for sale of any book, magazine or pamphlet designed, composed or illustrated as a whole to appeal to and commercially exploit prurient interest by combining covers, pictures, drawings, illustrations, caricatures, cartoons, words, stories and advertisements or any combination or combinations thereof devoted to the description, portrayal or deliberate suggestion of illicit sex, including adultery, prostitution, fornication, sexual crime and sexual perversion or to the exploitation of sex and nudity by the presentation of nude or partially nude female figures, posed, photographed or otherwise presented in a manner calculated to provoke or incite prurient interest, or any combination or combinations thereof, shall be a violation of this section."

[2] The information charged 159 counts of violating § 1141; in each instance a single count named a single book, although often the same book was the basis of three counts, each alleging one of the

(1960). He was sentenced to prison terms aggregating three years and ordered to pay $12,000 in fines for these crimes.[3] The Appellate Division, First Department, affirmed those convictions. 17 App. Div. 2d 243, 234 N. Y. S. 2d 342 (1962). The Court of Appeals affirmed without opinion. 15 N. Y. 2d 671, 204 N. E. 2d 209 (1964), remittitur amended, 15 N. Y. 2d 724, 205 N. E. 2d 201 (1965). We noted probable jurisdiction. 380 U. S. 960. We affirm.

Appellant was not prosecuted for anything he said or believed, but for what he did, for his dominant role in several enterprises engaged in producing and selling

three types of § 1141 offenses. Of these, 11 counts were dismissed on motion of the prosecutor at the outset of the trial and verdicts of acquittal were entered on seven counts at the end of trial. The remaining § 1141 counts on which appellant was convicted are listed in the Appendix to this opinion.

Appellant was also convicted on 33 counts charging violations of § 330 of the General Business Law for failing to print the publisher's and printer's names and addresses on the books. The Appellate Division reversed the convictions under these counts, and the Court of Appeals affirmed. The State has not sought review of that decision in this Court.

[3] The trial court divided the counts into five groups for purposes of sentencing. One group consisted of the possession counts concerning books seized from a basement storeroom in a warehouse; a second group of possession counts concerned books seized from appellant's retail bookstore, Publishers' Outlet; the third consisted of the publishing counts; the fourth consisted of the counts charging him with hiring others to prepare the books, and the fifth consisted of the counts charging violations of the General Business Law. Sentences of one year and a $3,000 fine were imposed on one count of each of the first four groups; the prison sentences on the first three were made consecutive and that on the count in the fourth group was made concurrent with that in the third group. A $500 fine was imposed on one count in the fifth group. Sentence was suspended on the convictions on all other counts. The suspension of sentence does not render moot the claims as to invalidity of the convictions on those counts.

allegedly obscene books. Fifty books are involved in this case. They portray sexuality in many guises. Some depict relatively normal heterosexual relations, but more depict such deviations as sado-masochism, fetishism, and homosexuality. Many have covers with drawings of scantily clad women being whipped, beaten, tortured, or abused. Many, if not most, are photo-offsets of type-written books written and illustrated by authors and artists according to detailed instructions given by the appellant. Typical of appellant's instructions was that related by one author who testified that appellant insisted that the books be "full of sex scenes and lesbian scenes . . . . [T]he sex had to be very strong, it had to be rough, it had to be clearly spelled out. . . . I had to write sex very bluntly, make the sex scenes very strong. . . . [T]he sex scenes had to be unusual sex scenes between men and women, and women and women, and men and men. . . . [H]e wanted scenes in which women were making love with women . . . . [H]e wanted sex scenes . . . in which there were lesbian scenes. He didn't call it lesbian, but he described women making love to women and men . . . making love to men, and there were spankings and scenes—sex in an abnormal and irregular fashion." Another author testified that appellant instructed him "to deal very graphically with . . . the darkening of the flesh under flagellation . . . ." Artists testified in similar vein as to appellant's instructions regarding illustrations and covers for the books.

All the books are cheaply prepared paperbound "pulps" with imprinted sales prices that are several thousand percent above costs. All but three were printed by a photo-offset printer who was paid 40¢ or 15¢ per copy, depending on whether it was a "thick" or "thin" book. The printer was instructed by appellant not to use appellant's name as publisher but to print some fic-

titious name on each book, to "make up any name and address." Appellant stored books on the printer's premises and paid part of the printer's rent for the storage space. The printer filled orders for the books, at appellant's direction, delivering them to appellant's retail store, Publishers' Outlet, and, on occasion, shipping books to other places. Appellant paid the authors, artists, and printer cash for their services, usually at his bookstore.

I.

Appellant attacks § 1141 as invalid on its face, contending that it exceeds First Amendment limitations by proscribing publications that are merely sadistic or masochistic, that the terms "sadistic" and "masochistic" are impermissibly vague, and that the term "obscene" is also impermissibly vague. We need not decide the merits of the first two contentions, for the New York courts held in this case that the terms "sadistic" and "masochistic," as well as the other adjectives used in § 1141 to describe proscribed books, are "synonymous with 'obscene.' " 26 Misc. 2d, at 154, 207 N. Y. S. 2d, at 393. The contention that the term "obscene" is also impermissibly vague fails under our holding in *Roth* v. *United States,* 354 U. S. 476, 491–492. Indeed, the definition of "obscene" adopted by the New York courts in interpreting § 1141 delimits a narrower class of conduct than that delimited under the *Roth* definition, *People* v. *Richmond County News, Inc.,* 9 N. Y. 2d 578, 586–587, 175 N. E. 2d 681, 685–686 (1961),[4] and thus § 1141, like the statutes in

---

[4] "It [obscene material covered by § 1141] focuses predominantly upon what is sexually morbid, grossly perverse and bizarre, without any artistic or scientific purpose or justification. Recognizable 'by the insult it offers, invariably, to sex, and to the human spirit' (D. H. Lawrence, Pornography and Obscenity [1930], p. 12), it is to be differentiated from the bawdy and the ribald. Depicting dirt for dirt's sake, the obscene is the vile, rather than the coarse, the blow to

*Roth,* provides reasonably ascertainable standards of guilt.[5]

Appellant also objects that § 1141 is invalid as applied, *first,* because the books he was convicted of publishing, hiring others to prepare, and possessing for sale are not obscene, and *second,* because the proof of scienter is inadequate.

1. *The Nature of the Material.*—The First Amendment prohibits criminal prosecution for the publication and dissemination of allegedly obscene books that do not satisfy the *Roth* definition of obscenity. States are free to adopt other definitions of obscenity only to the extent that those adopted stay within the bounds set by the constitutional criteria of the *Roth* definition, which

---

sense, not merely to sensibility. It smacks, at times, of fantasy and unreality, of sexual perversion and sickness and represents, according to one thoughtful scholar, 'a debauchery of the sexual faculty.' (Murray, Literature and Censorship, 14 Books on Trial 393, 394; see, also, Lockhart and McClure, Censorship of Obscenity: The Developing Constitutional Standards, 45 Minn. L. Rev. 5, 65.)" 9 N. Y. 2d, at 587, 175 N. E. 2d, at 686.

See also *People v. Fritch,* 13 N. Y. 2d 119, 123, 192 N. E. 2d 713, 716 (1963):

"In addition to the foregoing tests imposed by the decisions of the [United States] Supreme Court, this court interpreted section 1141 of the Penal Law in *People v. Richmond County News* . . . as applicable only to material which may properly be termed 'hard-core pornography.' "

[5] The stringent scienter requirement of § 1141, as interpreted in *People v. Finkelstein,* 9 N. Y. 2d 342, 345, 174 N. E. 2d 470, 472 (1961), also eviscerates much of appellant's vagueness claim. See, *infra,* pp. 510–512. See generally, *Boyce Motor Lines, Inc.* v. *United States,* 342 U. S. 337, 342; *American Communications Assn.* v. *Douds,* 339 U. S. 382, 412–413; *Screws* v. *United States,* 325 U. S. 91, 101–104 (opinion of MR. JUSTICE DOUGLAS); *United States* v. *Ragen,* 314 U. S. 513, 524; *Gorin* v. *United States,* 312 U. S. 19, 27–28; *Hygrade Provision Co.* v. *Sherman,* 266 U. S. 497, 501–503; *Omaechevarria* v. *Idaho,* 246 U. S. 343, 348.

restrict the regulation of the publication and sale of books to that traditionally and universally tolerated in our society.

The New York courts have interpreted obscenity in § 1141 to cover only so-called "hard-core pornography," see *People* v. *Richmond County News, Inc.*, 9 N. Y. 2d 578, 586–587, 175 N. E. 2d 681, 685–686 (1961), quoted in note 4, *supra.* Since that definition of obscenity is more stringent than the *Roth* definition, the judgment that the constitutional criteria are satisfied is implicit in the application of § 1141 below. Indeed, appellant's sole contention regarding the nature of the material is that some of the books involved in this prosecution,[6] those depicting various deviant sexual practices, such as flagellation, fetishism, and lesbianism, do not satisfy the prurient-appeal requirement because they do not appeal to a prurient interest of the "average person" in sex, that "instead of stimulating the erotic, they disgust and sicken." We reject this argument as being founded on an unrealistic interpretation of the prurient-appeal requirement.

Where the material is designed for and primarily disseminated to a clearly defined deviant sexual group, rather than the public at large, the prurient-appeal requirement of the *Roth* test is satisfied if the dominant theme of the material taken as a whole appeals to the prurient interest in sex of the members of that group. The reference to the "average" or "normal" person in *Roth*, 354 U. S., at 489–490, does not foreclose this holding.[7] In regard to the prurient-appeal requirement, the

---

[6] It could not be plausibly maintained that all of the appellant's books, including those dominated by descriptions of relatively normal heterosexual relationships, are devoid of the requisite prurient appeal.

[7] See *Manual Enterprises, Inc.* v. *Day*, 370 U. S. 478, 482 (opinion of HARLAN, J.); Lockhart and McClure, Censorship of Obscenity:

concept of the "average" or "normal" person was employed in *Roth* to serve the essentially negative purpose of expressing our rejection of that aspect of the *Hicklin* test, *Regina* v. *Hicklin*, [1868] L. R. 3 Q. B. 360, that made the impact on the most susceptible person determinative. We adjust the prurient-appeal requirement to social realities by permitting the appeal of this type of material to be assessed in terms of the sexual interests of its intended and probable recipient group; and since our holding requires that the recipient group be defined with more specificity than in terms of sexually immature persons,[8] it also avoids the inadequacy of the most-susceptible-person facet of the *Hicklin* test.

No substantial claim is made that the books depicting sexually deviant practices are devoid of prurient appeal to sexually deviant groups. The evidence fully establishes that these books were specifically conceived and marketed for such groups. Appellant instructed his authors and artists to prepare the books expressly to induce their purchase by persons who would probably be sexually stimulated by them. It was for this reason that appellant "wanted an emphasis on beatings and fetishism and clothing—irregular clothing, and that sort of thing,

---

The Developing Constitutional Standards, 45 Minn. L. Rev. 5, 72–73 (1960).

It is true that some of the material in *Alberts* v. *California*, decided with *Roth*, resembled the deviant material involved here. But no issue involving the obscenity of the material was before us in either case. 354 U. S., at 481, n. 8. The basic question for decision there was whether the publication and sale of obscenity, however defined, could be criminally punished in light of First Amendment guarantees. Our discussion of definition was not intended to develop all the nuances of a definition required by the constitutional guarantees.

[8] See generally, 1 American Handbook of Psychiatry 593–604 (Arieti ed. 1959), for a description of the pertinent types of deviant sexual groups.

and again sex scenes between women; always sex scenes had to be very strong." And to be certain that authors fulfilled his purpose, appellant furnished them with such source materials as Caprio, Variations in Sexual Behavior, and Krafft-Ebing, Psychopathia Sexualis. Not only was there proof of the books' prurient appeal, compare *United States* v. *Klaw,* 350 F. 2d 155 (C. A. 2d Cir. 1965), but the proof was compelling; in addition appellant's own evaluation of his material confirms such a finding. See *Ginzburg* v. *United States, ante,* p. 463.

2. *Scienter.*—In *People* v. *Finkelstein,* 9 N. Y. 2d 342, 344–345, 174 N. E. 2d 470, 471 (1961), the New York Court of Appeals authoritatively interpreted § 1141 to require the "vital element of scienter," and it defined the required mental element in these terms:

> "A reading of the statute [§ 1141] as a whole clearly indicates that only those who are in some manner aware of the *character* of the material they attempt to distribute should be punished. It is not innocent but *calculated purveyance* of filth which is exorcised . . . ." [9]   (Emphasis added.)

Appellant's challenge to the validity of § 1141 founded on *Smith* v. *California,* 361 U. S. 147, is thus foreclosed,[10]

---

[9] For a similar scienter requirement see Model Penal Code § 251.4 (2); Commentary, Model Penal Code (Tentative Draft No. 6, 1957), 14, 49–51; cf. Schwartz, Morals Offenses and the Model Penal Code, 63 Col. L. Rev. 669, 677 (1963).

We do not read Judge Froessel's parenthetical reference to knowledge of the contents of the books in his opinion in *People* v. *Finkelstein,* 11 N. Y. 2d 300, 304, 183 N. E. 2d 661, 663 (1962), as a modification of this definition of scienter. Cf. *People* v. *Fritch,* 13 N. Y. 2d 119, 126, 192 N. E. 2d 713, 717–718 (1963).

[10] The scienter requirement set out in the text would seem to be, as a matter of state law, as applicable to publishers as it is to booksellers; both types of activities are encompassed within subdivision 1 of § 1141. Moreover, there is no need for us to speculate as to whether this scienter requirement is also present in subdivision 2 of

and this construction of § 1141 makes it unnecessary for us to define today "what sort of mental element is requisite to a constitutionally permissible prosecution." *Id.*, at 154. The Constitution requires proof of scienter to avoid the hazard of self-censorship of constitutionally protected material and to compensate for the ambiguities inherent in the definition of obscenity. The New York definition of the scienter required by § 1141 amply serves those ends, and therefore fully meets the demands of the Constitution.[11] Cf. *Roth* v. *United States*, 354 U. S., at 495–496 (WARREN, C. J., concurring).

Appellant's principal argument is that there was insufficient proof of scienter. This argument is without merit. The evidence of scienter in this record consists, in part, of appellant's instructions to his artists and writers; his efforts to disguise his role in the enterprise that published and sold the books; the transparency of the character of the material in question, highlighted by the titles, covers, and illustrations; the massive number of obscene books appellant published, hired others to prepare, and possessed for sale; the repetitive quality of the sequences and formats of the books; and the exorbi-

---

§ 1141 (making it a crime to hire others to prepare obscene books), for appellant's convictions for that offense involved books for the publication of which he was also convicted.

No constitutional claim was asserted below or in this Court as to the possible duplicative character of the hiring and publishing counts.

[11] The first appeal in *Finkelstein* defining the scienter required by § 1141 was decided after this case was tried, but before the Appellate Division and Court of Appeals affirmed these convictions. We therefore conclude that the state appellate courts were satisfied that the § 1141 scienter requirement was correctly applied at trial.

The § 1141 counts did not allege appellant's knowledge of the character of the books, but appellant has not argued, below or here, that this omission renders the information constitutionally inadequate.

tant prices marked on the books. This evidence amply shows that appellant was "aware of the character of the material" and that his activity was "not innocent but calculated purveyance of filth."

## II.

Appellant claims that all but one of the books were improperly admitted in evidence because they were fruits of illegal searches and seizures. This claim is not capable in itself of being brought here by appeal, but only by a petition for a writ of certiorari under 28 U. S. C. § 1257 (3) (1964 ed.) as specifically setting up a federal constitutional right.[12] Nevertheless, since appellant challenged the constitutionality of § 1141 in this prosecution, and the New York courts sustained the statute, the case is properly here on appeal, and our unrestricted notation of probable jurisdiction justified appellant's briefing of the search and seizure issue. *Flournoy* v. *Weiner*, 321 U. S. 253, 263; *Prudential Ins. Co.* v. *Cheek*, 259 U. S. 530, 547. The nonappealable issue is treated, however, as if contained in a petition for a writ of certiorari, see 28 U. S. C. § 2103 (1964 ed.), and the unrestricted notation of probable jurisdiction of the appeal is to be understood as a grant of the writ on that issue. The issue thus remains within our certiorari jurisdiction, and we may, for good reason, even at this stage, decline to decide the merits of the issue, much as we would dismiss a writ of certiorari as improvidently granted. We think that this is a case for such an exercise of our discretion.

The far-reaching and important questions tendered by this claim are not presented by the record with sufficient

---

[12] Unlike the claim here, the challenges decided in the appeals in *Marcus* v. *Search Warrant*, 367 U. S. 717, and *A Quantity of Copies of Books* v. *Kansas*, 378 U. S. 205, implicated the constitutional validity of statutory schemes establishing procedures for seizing the books.

clarity to require or justify their decision. Appellant's standing to assert the claim in regard to all the seizures is not entirely clear; there is no finding on the extent or nature of his interest in two book stores, the Main Stem Book Shop and Midget Book Shop, in which some of the books were seized. The State seeks to justify the basement storeroom seizure, in part, on the basis of the consent of the printer-accomplice; but there were no findings as to the authority of the printer over the access to the storeroom, or as to the voluntariness of his alleged consent. It is also maintained that the seizure in the storeroom was made on the authority of a search warrant; yet neither the affidavit upon which the warrant issued nor the warrant itself is in the record. Finally, while the search and seizure issue has a First Amendment aspect because of the alleged massive quality of the seizures, see *A Quantity of Copies of Books* v. *Kansas,* 378 U. S. 205, 206 (opinion of BRENNAN, J.); *Marcus* v. *Search Warrant,* 367 U. S. 717, the record in this regard is inadequate. There is neither evidence nor findings as to how many of the total available copies of the books in the various bookstores were seized and it is impossible to determine whether the books seized in the basement storeroom were on the threshold of dissemination. Indeed, this First Amendment aspect apparently was not presented or considered by the state courts, nor was it raised in appellant's jurisdictional statement; it appeared for the first time in his brief on the merits.

In light of these circumstances, which were not fully apprehended at the time we took the case, we decline to reach the merits of the search and seizure claim; insofar as notation of probable jurisdiction may be regarded as a grant of the certiorari writ on the search and seizure issue, that writ is dismissed as improvidently granted. "Examination of a case on the merits . . . may bring into 'proper focus' a consideration which . . .

later indicates that the grant was improvident." *The Monrosa* v. *Carbon Black,* 359 U. S. 180, 184.

*Affirmed.*

[For dissenting opinion of Mr. Justice Douglas, see *ante,* p. 482.]

## APPENDIX TO OPINION OF THE COURT.

### THE CONVICTIONS BEING REVIEWED.

| Exhibit No. | Title of Book | § 1141 Counts Naming the Book | | |
|---|---|---|---|---|
| | | Possession | Pub-lishing | Hiring Others |
| 1 | Chances Go Around | 1 | 63 | 111 |
| 2 | Impact | 2 | 64 | 112 |
| 3 | Female Sultan | 3 | 65 | 113 |
| 4 | Satin Satellite | 4 | | |
| 5 | Her Highness | 5 | 67 | 115 |
| 6 | Mistress of Leather | 6 | 68 | 116 |
| 7 | Educating Edna | 7 | 69 | 117 |
| 8 | Strange Passions | 8 | 70 | 118 |
| 9 | The Whipping Chorus Girls | 9 | 71 | 119 |
| 10 | Order Of The Day and Bound Maritally | 10 | 72 | 120 |
| 11 | Dance With the Dominant Whip | 11 | 73 | 121 |
| 12 | Cult Of The Spankers | 12 | 74 | 122 |
| 13 | Confessions | 13 | 75 | 123 |
| 14 & 46 | The Hours Of Torture | 14 & 40 | 76 | 124 |
| 15 & 47 | Bound In Rubber | 15 & 41 | 77 | 125 |
| 16 & 48 | Arduous Figure Training at Bondhaven | 16 & 42 | 78 | 126 |
| 17 & 49 | Return Visit To Fetterland | 17 & 43 | 79 | 127 |
| 18 | Fearful Ordeal In Restraintland | 18 | 80 | 128 |
| 19 & 50 | Women In Distress | 19 & 44 | 81 | 129 |
| 20 & 54 | Pleasure Parade No. 1 | 20 & 48 | 82 | 130 |
| 21 & 57 | Screaming Flesh | 21 & 51 | 86 | 134 |
| 22 & 58 | Fury | 22 & 52 | | |
| 23 | So Firm So Fully Packed | 23 | 87 | 135 |
| 24 | I'll Try Anything Twice | 24 | | |
| 25 & 59 | Masque | 25 & 53 | | |
| 26 | Catanis | 26 | | |

| Exhibit No. | Title of Book | § 1141 Counts Naming the Book | | |
| --- | --- | --- | --- | --- |
| | | Possession | Pub-lishing | Hiring Others |
| 27 | The Violated Wrestler | 27 | 89 | 137 |
| 28 | Betrayal | 28 | | |
| 29 | Swish Bottom | 29 | 90 | 138 |
| 30 | Raw Dames | 30 | 91 | 139 |
| 31 | The Strap Returns | 31 | 92 | 140 |
| 32 | Dangerous Years | 32 | 93 | 141 |
| 43 | Columns of Agony | 37 | 95 | 144 |
| 44 | The Tainted Pleasure | 38 | 96 | 145 |
| 45 | Intense Desire | 39 | 97 | 146 |
| 51 | Pleasure Parade No. 4 | 45 | 85 | 133 |
| 52 | Pleasure Parade No. 3 | 46 | 84 | 132 |
| 53 | Pleasure Parade No. 2 | 47 | 83 | 131 |
| 55 | Sorority Girls Stringent Initiation | 49 | 98 | 147 |
| 56 | Terror At The Bizarre Museum | 50 | 99 | 148 |
| 60 | Temptation | 57 | | |
| 61 | Peggy's Distress On Planet Venus | 58 | 101 | 150 |
| 62 | Ways of Discipline | 59 | 102 | 151 |
| 63 | Mrs. Tyrant's Finishing School | 60 | 103 | 152 |
| 64 | Perilous Assignment | 61 | 104 | 153 |
| 68 | Bondage Correspondence | | 107 | 156 |
| 69 | Woman Impelled | | 106 | 155 |
| 70 | Eye Witness | | 108 | 157 |
| 71 | Stud Broad | | 109 | 158 |
| 72 | Queen Bee | | 110· | 159 |

MR. JUSTICE HARLAN, concurring.

On the issue of obscenity I concur in the judgment of affirmance on premises stated in my dissenting opinion in *A Book Named "John Cleland's Memoirs of a Woman of Pleasure"* v. *Attorney General of Massachusetts, ante,* p. 455. In all other respects I agree with and join the Court's opinion.

MR. JUSTICE BLACK, dissenting.

The Court here affirms convictions and prison sentences aggregating three years plus fines totaling $12,000 im-

posed on appellant Mishkin based on state charges that he hired others to prepare and publish obscene books and that Mishkin himself possessed such books. This Court has held in many cases that the Fourteenth Amendment makes the First applicable to the States. See for illustration cases collected in my concurring opinion in *Speiser* v. *Randall,* 357 U. S. 513, 530. Consequently upon the same grounds that I dissented from a five-year federal sentence imposed upon Ginzburg in No. 42, *ante,* p. 476, for sending "obscene" printed matter through the United States mails I dissent from affirmance of this three-year state sentence imposed on Mishkin. Neither in this case nor in *Ginzburg* have I read the alleged obscene matter. This is because I believe for reasons stated in my dissent in *Ginzburg* and in many other prior cases that this Court is without constitutional power to censor speech or press regardless of the particular subject discussed. I think the federal judiciary because it is appointed for life is the most appropriate tribunal that could be selected to interpret the Constitution and thereby mark the boundaries of what government agencies can and cannot do. But because of life tenure, as well as other reasons, the federal judiciary is the least appropriate branch of government to take over censorship responsibilities by deciding what pictures and writings people throughout the land can be permitted to see and read. When this Court makes particularized rules on what people can see and read, it determines which policies are reasonable and right, thereby performing the classical function of legislative bodies directly responsible to the people. Accordingly, I wish once more to express my objections to saddling this Court with the irksome and inevitably unpopular and unwholesome task of finally deciding by a case-by-case, sight-by-sight personal judgment of the members of this Court what pornography (whatever that means) is too hard core for people

to see or read. If censorship of views about sex or any other subject is constitutional then I am reluctantly compelled to say that I believe the tedious, time-consuming and unwelcome responsibility for finally deciding what particular discussions or opinions must be suppressed in this country, should, for the good of this Court and of the Nation, be vested in some governmental institution or institutions other than this Court.

I would reverse these convictions. The three-year sentence imposed on Mishkin and the five-year sentence imposed on Ginzburg for expressing views about sex are minor in comparison with those more lengthy sentences that are inexorably bound to follow in state and federal courts as pressures and prejudices increase and grow more powerful, which of course they will. Nor is it a sufficient answer to these assuredly ever-increasing punishments to rely on this Court's power to strike down "cruel and unusual punishments" under the Eighth Amendment. Distorting or stretching that Amendment by reading it as granting unreviewable power to this Court to perform the legislative function of fixing punishments for all state and national offenses offers a sadly inadequate solution to the multitudinous problems generated by what I consider to be the un-American policy of censoring the thoughts and opinions of people. The only practical answer to these concededly almost unanswerable problems is, I think, for this Court to decline to act as a national board of censors over speech and press but instead to stick to its clearly authorized constitutional duty to adjudicate cases over things and conduct. Halfway censorship methods, no matter how laudably motivated, cannot in my judgment protect our cherished First Amendment freedoms from the destructive aggressions of both state and national government. I would reverse this case and announce that the First and Fourteenth Amendments taken together command that neither Con-

gress nor the States shall pass laws which in any manner abridge freedom of speech and press—whatever the subjects discussed.   I think the Founders of our Nation in adopting the First Amendment meant precisely that the Federal Government should pass "no law" regulating speech and press but should confine its legislation to the regulation of conduct.   So too, that policy of the First Amendment made applicable to the States by the Fourteenth, leaves the States vast power to regulate conduct but no power at all, in my judgment, to make the expression of views a crime.

MR. JUSTICE STEWART, dissenting.

The appellant was sentenced to three years in prison for publishing numerous books.   However tawdry those books may be, they are not hard-core pornography, and their publication is, therefore, protected by the First and Fourteenth Amendments.   *Ginzburg* v. *United States, ante,* p. 497 (dissenting opinion).   The judgment should be reversed.\*

---

\*See *Ginzburg* v. *United States, ante,* p. 497, at 499, note 3 (dissenting opinion).   Moreover, there was no evidence at all that any of the books are the equivalent of hard-core pornography in the eyes of any particularized group of readers.   Cf. *United States* v. *Klaw,* 350 F. 2d 155 (C. A. 2d Cir.).

Although the New York Court of Appeals has purported to interpret § 1141 to cover only what it calls "hard-core pornography," this case makes abundantly clear that that phrase has by no means been limited in New York to the clearly identifiable and distinct class of material I have described in *Ginzburg* v. *United States, ante,* p. 497, at 499, note 3 (dissenting opinion).