**UNITED STATES of America**

v.

**Robert BARANOV, Harvey B. Levitt, H. B. Levitt and Associates, Inc., dba Flag Publications, Sahara Publications, and Vance Peters and Associates, Defendants.**

**No. 37570.**

United States District Court
S. D. California.
Jan. 18, 1968.

Edwin L. Miller, Jr., U. S. Atty., John A. Mitchell, Asst. U. S. Atty., San Diego, Cal., for the United States.

Atkins & Jacobson, Beverly Hills, Cal., for defendants.

## AMENDED OPINION AND ORDER DENYING MOTION FOR NEW TRIAL

SOLOMON, Chief Judge:

A jury convicted the defendants on 16 counts of having knowingly mailed or caused to be mailed obscene books, magazines and records, as well as advertisements for obscene books, magazines and records, all in violation of 18 U.S.C. § 1461.

The books and magazines are similar to those described in Mishkin v. New York, 383 U.S. 502, 86 S.Ct. 958, 16 L. Ed.2d 56 (1966), and United States v. Klaw, 350 F.2d 155 (2 Cir. 1965).

The Nutrex books (actually booklets) are "bondage books" and bear titles like "Forceful Wife Binds Man in Female Clothes" or "Revengeful Spanking Bondage Predicament." They contain pictures of men and women forcibly bound and gagged. Dr. Cavanaugh, the government expert, testified that these pictures and the poorly written text appeal to the prurient interest of a particular deviant group. Other booklets of the same type contain numerous small pictures of scantily clad women to advertise other bondage booklets, as well as "spanking" or "wrestling" booklets, which have a specific appeal to sadists and masochistic groups.

The "Studies in Corporal Punishment" series ("Spanked in Bed" and "Domination by the Whip," "Teenage Thrashing," "The Whipping Chorus," and "Teenage Spanking") contain crudely drawn sketches of nude or almost-nude young women who are being beaten by a man or a woman either by hand or with a strap or whip. Most of them contain advertisements for similar books, magazines or records which may be purchased from the defendants' com-

panies at prices ranging from $3.00 to $10.00. Most of them cost only a small amount to produce.

There were magazines for female homosexuals. The "Lesbian Quarterly" contains approximately 40 pages, six of which are full-page pictures of two nude young women. Another full-page picture is of one nude girl. Most of the pictures are front or three-quarter views. The "Lesbian Quarterly" also contains an article "Nudism, Right or Wrong," two short stories, "Switchabout Sweethearts," and "Assignment Sex," and two poems, "My Lesbian Love," and "Love Transcending." The poems appear to be in defense of lesbianism. Neither the stories nor the poems go beyond the limits of candor or are offensive.

The magazine also contains two pages of classified listings, a few of which read as follows:

"Wisconsin Bachelor, Handsome Adult. Needs strong dominant woman to enslave him. Will be humble and obedient to any command. Near Chicago area."

"New York, New York. Young man, 28 years, fascinated by lingerie, etc., willing to perform for understanding woman, preferably, but not necessarily, older than myself."

"Bayon, N. J. Are you a naughty girl who should be spanked by mature dominant male? Passive lady, white only, contact me."

"Melrose Park, Ill. Docile male, 29 years, single, is in desperate need of discipline from a domineering woman or women. Interests include discipline, transvestitism, bloomers, spanking, nudism, dominant women, erotic (female) dress."

It also contains five pages of glossary. The following are a few of the definitions:

"Anilingus. Sexual pleasure obtained from licking the anus."

"Buggery. Sodomy. Sexual intercourse by males through the anus."

"Coprophagy. An abnormal affinity for filth, especially feces and for things connected therewith."

"Cunnilingus. The application of the mouth or tongue to the vulva."

"Fellatio. The act of taking the penis into the mouth."

[The definition of cunnilingus contained the comforting thought that "This is not considered a perversion by modern medical authorities when performed as pre-coital gesture. It becomes a perversion only when such gesture takes the place of coitus." A similar explanation follows the definition of fellatio.]

"Necrophilia. Morbid attraction with corpses. Sexual intercourse with a dead body."

"Pederasty. Sexual intercourse with boys via the anus."

"Transvestite. One who obtains sexual gratification from dressing in the clothes of the opposite sex."

"Tribadism. Mutual friction of the genitals, especially the clitoris, between women as a means of achieving a sexual orgasm."

At the completion of the evidence and arguments I instructed the jury that to return a verdict of guilty on the counts relating to the mailing of the books, magazines and records, they must find that the government proved beyond a reasonable doubt each of the following five elements:

First: That the dominant theme of the material taken as a whole appeals to the prurient interest in sex of a particular deviant class or group.

Second: That the material is patently offensive because it goes substantially beyond the limits of candor dealing with matters relating to sex and nudity as established by contemporary community standards.

Third: That the material is utterly without redeeming social value.

Fourth: That the defendants in selling and attempting to sell such material engaged in pandering—that is, in the

business of purveying textual or graphic matter openly advertised to appeal to the erotic interests of potential customers.

Fifth: That the particular defendant knew that the material was obscene at the time he caused it to be mailed.

Defendants distributed a number of pamphlets and magazines for male homosexuals. "Hellenic Sun" is of the sunbathing variety. On the front outside and inside covers there are photographs of nude male models with their genitals emphasized, and on the back outside cover there is a front view of two males, both of whom appear to have erections. On the inside cover there is a full front view of a nude male. The magazine contains 32 pages, 20 of which contain photographs of nude men with their genitals prominently displayed. In some of the photographs the pelvis of the model is extended forward in order to emphasize the genitals.

The articles are innocuous and have no relation to the pictures. One is called, "The Truth about Exercise." This article suggests that one take brisk walks and that if one is over 40 not to engage in strenuous exertion. Another is called "Neglecting Prints," which deals with the manner of caring for photographic negatives. This article covers about five pages, and the pages are separated by four full-page pictures of nude male figures. There is also an article on picnics, which suggests the type of paper plates one should bring, advises against butter and recommends mayonnaise. There is also an article entitled, "Cool Hints for Hot Days," which recommends an early morning swim, the wearing of light clothing, and a wide-brimmed hat to protect one's face and neck from the hot sun. It also recommends the wearing of dark glasses to protect one's eyes from the glare of the sun. The picture opposite this advice is a full front view of a man with his arms folded and his genitals showing. He is neither wearing dark glasses nor a wide-brimmed hat. In fact, he is completely nude. The text is merely a transparent attempt to legalize hard core pornography.

"Basic Approach to Drawing the Nude" consists of four pamphlets and is more expensive. If the pamphlets are purchased singly, they cost $7.00 for each pamphlet, but the set may be purchased for only $25.00.

Volume 1 allegedly gives some simple instructions on how to draw, together with some diagrams. There are four photographs of young men with sketches allegedly drawn from the photographs on the opposite page. There are also four drawings of young men or young women, or both together, in suggestive poses. The balance of the booklet consists of more than 40 pages of nude figures. Most of them are front or three-quarter views of young men, but there are a few photographs of nude young boys and nude young women.

Volume 2 has less than a page of text, but approximately 70 photographs, the great bulk of which are of young boys. While a few pictures show the buttocks, most of them show front views.

Volume 3 has a little more than one page of text, with about 70 pages of pictures with two or more nude boys who are posing, playing, or wrestling.

Volume 4 has one page of text and approximately 70 pages of single male nude figures. Practically all of them are front-view poses with the genitals prominently displayed.

The name and address of the publisher do not appear on the books; and while the text sometimes refers to photographs on particular pages, the pages are unnumbered.

A Professor of Art at San Diego State University testified for the government. He is an artist who has often exhibited his own works, and many of his works are in permanent collections of important museums. He has earned several advanced degrees in art and teaches courses in the drawing of the nude figure. He testified that the text in all of the books was worthless and often misleading; that the male figure is

almost never used in beginners' art classes; and that photographs have no value for the student who is attempting to learn to draw the nude figure.

Dr. Cavanaugh testified that the photographs of the men were designed for homosexuals and that the positions of the models were calculated to arouse erotic feelings in the male homosexual. Pamphlets 2 and 3 were primarily designed for the pedophile (men who are attracted to young boys).

A former employee of defendant Levitt testified that Levitt admitted to her that the pamphlets were intended for homosexuals.

There was evidence that the defendants mailed thousands of circulars advertising the magazines, pamphlets and records which the government contends are obscene. In addition, the defendants' magazines advertise other publications and films which they distribute. The circulars reproduce the front cover of the publication sought to be sold, which shows front or three-quarter views of nude male or female models. A few have small pieces of white paper over the genitalia of the men or the vulvae of the women. Some contain a partial index of the magazine advertised which have provocative titles, and on the reverse side a "confidential ad form," apparently for those deviates who seek new acquaintances.

The Vance Peters advertisement contains photographs even more provocative than some of the other publications which the defendants circulated, but this advertisement does not contain the usual certificate requiring the subscriber to state "that I am over 21 years of age and the merchandise ordered is for my personal use and will not be given or shown in any manner to any persons under 21 years of age."

The defendants sought judgments of acquittal at the conclusion of the government's evidence and also after all the evidence had been admitted. I denied their motions.

I was well aware of the heavy burden of the Judge in a case of this kind, and before I submitted the case to the jury, I made the constitutional determination that the material was obscene. I found that it was patently offensive, that it was designed to and did appeal to the particular deviant group, and that it was utterly without redeeming social value. I also found that the advertising matter had the leer of the sensualist and was deliberately directed to the erotic interest of potential customers. Lastly, I found that the defendants knew that the material was obscene at the time it was mailed.

Prior to instructing the jury, I examined the defendants' requests and informed their counsel which requests would be granted. At the same time I informed counsel that I usually use my own words to express the thoughts contained in the requested instructions. I also told counsel how I intended to instruct on other matters, but at the time of the conference I had not drafted the exact instructions. Counsel were permitted to make their objections at this hearing.

I instructed on all aspects of the case.

At the conclusion of my instructions, I permitted counsel to make additional objections outside the presence of the jury. The defendants took a few additional exceptions.

Defendants objected to the instruction on pandering, but refused to stipulate that I could properly omit it as an element which the jury would have to find in order to convict the defendants.

The jury returned verdicts finding the defendants guilty on all counts.

Defendants, in their motion for a new trial, assert that the evidence is insufficient to support the conviction because the government failed to prove that the materials are patently offensive and that proof of prurient appeal does not eliminate the necessity of proving that the materials are patently offensive. Defendants contend that expert evidence is

required on the issue of patent offensiveness.

It is true that the government did not call an expert witness to testify on the issue of patent offensiveness, but it did call Dr. Cavanaugh, who testified that the materials were directed to particular deviant groups, that they had a prurient appeal to particular deviant groups, and that the materials were utterly without social importance.

Defendants introduced an expert who testified that the materials were not patently offensive, and the defendants offered some books sold in San Diego to show the contemporary community standards.

I do not believe the testimony of the defendants' expert, and the jury was not required to believe him. His testimony was contradictory, and the jury could properly find that the opposite of his conclusion was true. The books and magazines which defendants introduced were purchased in two book stores on Broadway Street in San Diego, which we all know is in the center of traffic for thousands of servicemen who come to San Diego for relaxation from Coronado and from surrounding military bases. Defendants did not introduce evidence on the size of the circulation of any of these magazines or books, nor did they make any comparison with the circulation of Look, Life, Time, Newsweek, Woman's Home Companion, or other such magazines.

In *Mishkin*, supra, the defendant was convicted of having violated a New York statute which the Court found equated the display of deviance with obscenity. There, as here, bondage and flagellation books, as well as books on homosexuality and fetishism, were sold. The Court held that the New York statute as interpreted by New York Courts was more stringent than federal constitutional requirements, and upheld the conviction. Although most, if not all, of the cases refer to prurient appeal and patent offensiveness, none refer to the character of the evidence necessary to prove patent offensiveness.

■ Nudity in itself is not obscene. However, there are positions of an individual male figure or two male or female models alone or together which because of their position may be obscene.

■ The jury by examining defendants' materials in this case could properly conclude that the materials were patently offensive without the aid of an expert.

Defendants contend that I failed to inform their counsel in a fair way what the charge would be so that counsel could argue the case in the light of the instructions.

Rule 30 and the cases which he cites show that I strictly complied with the requirements of that rule. He now complains that I did not inform him about many other instructions. Although I was not required to do it, I informed him generally and often specifically how I intended to instruct.

Defendants object to my instructions defining obscenity, in which I stated, " * * * does it offend the common conscience of the community by present-day standards." This definition is taken from Roth v. United States, 354 U.S. 476, 77 S.Ct. 1304, 1 L.Ed.2d 1498 (1957). Defendants' objection is apparently directed to the failure of the government to produce evidence on patent offensiveness, and this issue, as discussed earlier, is without merit.

■ Defendants also contend that government counsel must read all the materials in open Court or that the Court order each of the jurors "one by one to read and examine each exhibit."

Counsel failed to cite a case which requires that procedure, and in my independent examination I was unable to find such authority. I gave both counsel the privilege of reading to the jury all or any portion of the admitted exhibits. If government counsel failed to read the entire exhibit, defendants' counsel was privileged to read the balance himself. Defendants requested that the second side of the record "Tortura—The Sounds of Pain and Pleasure"

**616**

be played. This was done. Likewise, portions of books and magazines were read to the jury at defendants' request. Many of the exhibits were read in full. Although the jury was required to find that the material, considered as a whole, offends the statute, such a finding does not require that every word be read. I can see no possible benefit from reading in full articles on the proper care of negative prints or what to do at a picnic, particularly those portions which suggest that one bring plenty of pickles or the admonition that one use a wide-brimmed hat and dark glasses when one is in the sun. It is obvious that this material was inserted as an attempt to legally protect the defendants' pornographic and obscene materials. One can determine the dominant theme without reading every word in a booklet.

In my instructions I urged the jury to read the exhibits, and they had ample time before the verdict was returned to read or examine the portions not read in Court.

█ The last specification upon which defendants filed a brief seeks relief on the basis that the government read the entire text of one magazine while the defendant Levitt was on the stand.

In their brief, counsel states: "In the case at bar, the prosecutor, during cross-examination of the defendant, Harvey Levitt, chose to read one exhibit on lesbianism and particularly a glossary of definitions of especially reprehensible definitions of sexual perversions. At the conclusion of the reading, no questions were asked of defendant, Harvey Levitt. It was obvious that the purpose was to appeal to the prejudice of the jury against the hateful ideas read and to smear defendant with the detestable ideas."

Defendants failed to object to government counsel's reading the glossary or any other portion of the magazine either before or during the reading.

This is an appropriate place to point out that most of the terms defined had no relation to the pictures or the text. This magazine was not intended for physicians or psychiatrists or other such persons who had an intellectual interest in such matters. This glossary was included for the same reason as the classified listing—that is, to appeal to the prurient interest of the readers and to titillate and arouse their erotic feelings. Apparently defendants did not want to overlook any deviant group or any curious young man or woman who might want to purchase defendants' materials. If a person was not titillated by homosexual literature or pictures, the defendants had material available for those interested in sadism, masochism, fetishism, or some other deviant activity.

If such literature or pictures were not included in the magazine itself, the advertisements in the magazines or in the mailed leaflets told how to obtain such literature from Flagg Publications, Sahara Publications, or Vance Peters and Associates, all assumed names for H. B. Levitt and Associates, Inc., a company owned by defendant. I believe that here as in Mishkin v. New York, supra, and Ginzburg v. United States, 383 U.S. 463, 86 S.Ct. 942, 16 L.Ed.2d 31 (1966), we can "view the publications against a background of commercial exploitation of erotica solely for the sake of their prurient appeal."

In the motion for a new trial there were other specifications of error on which the defendants failed to submit any authority. I have examined all of them, and I find they are without merit.

Defendants' motion for a new trial or for a judgment notwithstanding the verdict is denied.