**UNITED STATES**

v.

**ONE REEL OF FILM.**

**Civ. A. No. MC 73-54.**

United States District Court,
D. Massachusetts.

May 15, 1973.

Frederic R. Kellogg, Asst. U. S. Atty., for plaintiff.

John J. Crowley, Jr., Boston, Mass., for claimant.

MEMORANDUM

FRANK J. MURRAY, District Judge.

This case came on to be heard by the court sitting without jury on the complaint filed by the United States Attorney for this district alleging that the film "Deep Throat" is obscene and immoral, and seeking an order for forfeiture of the film and its container pursuant to the provisions of 19 U.S.C. § 1305(a).[1]

---

1. 19 U.S.C. § 1305(a) provides in pertinent part:

All persons are prohibited from importing into the United States from any foreign country . . . any obscene . . . print, picture, . . . or other representation, which is obscene or immoral . . . . *Provided further,*

The film in the form viewed by the witnesses and the court, and its container, arrived at Logan Airport, Boston, on March 13, 1973, having been imported into the United States from Canada by Sack Theatres Corp., a corporation with its place of business in Boston. On March 16 the film and container were seized by authorized officers of the United States Customs Service, and this complaint was filed thereafter. Gerard Damiano Film Productions, Inc., a corporation with its usual place of business in New York City, filed a notice of claim as owner of the film, and has defended against the complaint and the forfeiture sought thereby.

This is a civil proceeding against the film itself, not a criminal prosecution, and the court has jurisdiction under 28 U.S.C. § 1355 and 19 U.S.C. § 1305. Forfeiture pursuant to section 1305(a) would suppress the film entirely, and this the First Amendment forbids unless "Deep Throat" is found proscribably obscene. *See* United States v. Thirty-Seven (37) Photographs, 402 U.S. 363, 91 S.Ct. 1400, 28 L.Ed.2d 822 (1970). Since the film was imported for commercial use only, the court's inquiry will be limited to intended exhibition of "Deep Throat" to audiences of adults in a public theatre where entertainment films are shown for an admission price. No evidence of any advertisement or intended promotion of "Deep Throat" was offered, hence, the question of pandering is not involved.

I

At the trial it was stipulated that "Deep Throat" is a 35-millimeter film, runs for approximately sixty (60) minutes, and is in color with a sound track. During the argument the claimant represented that the film was imported for commercial use in public theatres where entertainment films are shown for an admission price. Expert witnesses were called by each party and gave testimony. The film and its container were received in evidence, and are incorporated herein by reference and made part hereof.

"Deep Throat" contains scenes of explicit heterosexual intercourse, including group sex, and emphasizes various scenes of explicit penetration, fellatio, cunnilingus, female masturbation, anal sodomy, and seminal ejaculation. None of the scenes of sexual activity is simulated. One scene, referred to at the trial by counsel as the "Coca-cola scene", involved behavior of extraordinary, unbelievable and bizarre character on the part of the female star and a male. No attempt was made to count or tabulate the various scenes of sexual activity. But they dominate the film in depiction and running time to such extent that, following the opening innocuous few minutes (probably not more than eight) until "The End" flashes on the

That the Secretary of the Treasury may, in his discretion, admit the so-called classics or books of recognized and established literary or scientific merit, but may, in his discretion, admit such classics or books only when imported for non-commercial purposes.

Upon the appearance of any such book or matter at any customs office, the same shall be seized and held by the appropriate customs officer to await the judgment of the district court as hereinafter provided; and no protest shall be taken to the United States Customs Court from the decision of such customs officer. Upon the seizure of such book or matter such customs officer shall transmit information thereof to the district attorney of the district in which is situated the office at which such seizure has taken place, who shall institute proceedings in the district court for the forfeiture, confiscation, and destruction of the book or matter seized. Upon the adjudication that such book or matter thus seized is of the character the entry of which is by this section prohibited, it shall be ordered destroyed and shall be destroyed. Upon adjudication that such book or matter thus seized is not of the character the entry of which is by this section prohibited, it shall not be excluded from entry under the provisions of this section.

In any such proceeding any party in interest may upon demand have the facts at issue determined by a jury and any party may have an appeal or the right of review as in the case of ordinary actions or suits.

screen, scenes of sexual acts cascade one upon the next with minor interruptions. All these are accompanied by musical sounds and some dialogue, and enlivened on two occasions with bells ringing, bombs and rockets bursting. Camera angles and close-ups give maximum emphasis in time and dimensions to the genitalia during the sexual exhibitions.

In its explicitness "Deep Throat" goes beyond any film which has been examined by the courts, and probably beyond anything thus far exhibited in public theatres in this country. *See* People of State of New York v. Mature Enterprises, Inc., Criminal Court of City of New York, 1973, 343 N.Y.S.2d 911. The explicit sexual activity displayed is hardly comparable to other films considered by the federal courts and found to be non-obscene. *Compare* Jacobellis v. Ohio, 378 U.S. 184, 84 S.Ct. 1676, 12 L.Ed.2d 793 (1964) (one explicit love scene on last reel of film); United States v. 35 MM. Motion Picture Film Entitled "Language of Love", 432 F.2d 705 (2d Cir. 1970) (explicit sexual scenes, a close-up of a gynecological examination done by bona-fide Swedish physicians, and an explicit sequence of female masturbation); United States v. One Motion Picture Film Entitled "I Am Curious Yellow", 404 F.2d 196 (2d Cir. 1968) (explicit sexual scene taking 10 minutes of a total of 120); United States v. One Carton Positive Motion Picture Film Entitled "491", 367 F.2d 889 (2d Cir. 1960) (act of sodomy, homosexuality, self-mutilation, prostitution); United States v. One Carton Positive Motion Picture Film Entitled "Technique of Physical Love", 314 F.Supp. 1334 (E.D.La.1970) (demonstration by models of various positions of sexual intercourse, no explicit sexual activity).

2. Roth v. United States, 354 U.S. 476, 77 S.Ct. 1304, 1 L.Ed.2d 1498 (1957); Memoirs v. Massachusetts, 383 U.S. 413, 86 S.Ct. 975, 16 L.Ed.2d 1 (1966).

3. The Government's expert witnesses all testified as to their occupations, backgrounds, education, and other qualifications. The following data is a synthesis

II

The sole disputed issue at the trial was whether "Deep Throat" is obscene and therefore not protected by the First Amendment. Evidence offered by the parties related to the *Roth-Memoirs* [2] tests, so called, on the question of obscenity of the film, tests which have been the subject of extended consideration by the members of the Supreme Court. In the recent case of United States v. Palladino, 475 F.2d 65 (1st Cir. 1973), these tests were stated as follows:

The three-fold test of Roth v. United States, 354 U.S. 476, 77 S.Ct. 1304, 1 L.Ed.2d 1498 (1957) and Memoirs v. Massachusetts, 383 U.S. 413, 86 S.Ct. 975, 16 L.Ed.2d 1 (1966), is semantically clear: (1) do the materials, taken as a whole, appeal primarily to prurient interests of the average adult or, if directed to deviants, to the prurient interests of the intended group, Mishkin v. New York, 383 U.S. 502, 86 S.Ct. 958, 16 L.Ed.2d 56 (1966)?; (2) are the materials patently offensive because they affront contemporary community standards relating to sexual matters?; [2]

2. We have previously held that in federal prosecutions the referent for such standards is the nation. Excellent Publications, Inc. v. United States, 309 F.2d 362, 365 (1st Cir. 1962). . . .

and (3) are the materials utterly without redeeming social value?. *Id.* at 69.

■ To meet its burden of proof under the Roth-Memoirs tests the Government presented the testimony of three expert witnesses.[3] The claimant also of-

of their qualifications drawn from the transcript.
1) *Murray L. Cohen, Ph.D.*
Dr. Cohen is a psychologist, a Professor of Psychology at Boston University, and the Director of the Clinical Psychology Program in the graduate school at Boston University.

fered testimony of three experts.[4] Aside from the possible exposure of the court to "perhaps much testimonial nonsense" (*see* United States v. Palladino,

Dr. Cohen received his Bachelor's degree in Psychology from New York University, his Master's in Psychology from the University of Missouri, and his Ph.D. from Boston University. After receiving his Ph.D., he spent a year as a staff psychologist with the Veterans' Administration and three months as a supervisory psychologist there. Thereafter, he returned to Boston University as a faculty member. He has also been a hospital consultant to various hospitals in the Greater Boston Area and a clinical supervisor at such hospitals for the treatment of emotional behavior disorders.

Dr. Cohen has had numerous research grants, one of which dealt with the specific problems of the sexual offender. He has also done research and consulting with respect to sexual psychology as a consultant to the Division of Legal Medicine since 1957.

Dr. Cohen has published a number of papers in scientific journals, mostly dealing with problems in sexual deviation. He is a member of the American Psychological Association and the Association of University Professors.

2) *Jack Levin, Ph.D.*

Dr. Levin is a sociologist and a Professor of Sociology at Northeastern University. He received a Bachelor's degree in Sociology from American International College; a Master's degree in Communication Research from Boston University; and a Ph.D. in Sociology from Boston University.

Dr. Levin has received five grants and awards for his work including a 1970 grant from the President's Commission on Obscenity and Pornography. He teaches fourteen courses in the field of American Sociology, among them courses in contemporary mass communication and standards of community behavior in America. He has published some eighteen articles and three books, and he did a study for the President's Commission on Obscenity and Pornogphy comparing the representation and depiction of sexual matters in the so-called "underground press" to the same in the "straight" press.

Dr. Levin is President-elect of the Massachusetts Sociological Association and belongs to three other unspecified professional associations. He purports to have a firm grounding in three fields: the American family, the American culture, and mass media.

His qualifications as an expert witness were challenged, but the court permitted him to testify *de bene*, subject to a motion to strike, which motion was made at the completion of his testimony. That motion was reserved and it is now hereby denied.

3) *Professor John Lord*

Professor Lord is a Professor of Television and Film Art at Boston University. He receive a diploma in politics, modern history, and economics from the University of Manchester, England. He received a graduate degree in English from Oxford. At Boston University he has a joint appointment between the School of Public Communications in the Broadcast and Film Division, and the School of Fine and Applied Arts in the Theater Division. He currently teaches a course in "Broadcast Journalism" at the School of Public Communications.

Professor Lord has experience in film making and has been active in the theater both as a professional and an amateur. Much of his work has been in Television as a writer and as an associate producer for various national networks. He also has some experience as a director. His experience purports to have given him considerable exposure to acting and other technical aspects of cinematographic production.

4. The following data concerning the education, background, occupation, and qualifications of each of the claimant's expert witnesses is synthesized from the transcript.

1) *Eleanor Hamilton, Ph.D.*

Dr. Hamilton is a marriage counsellor and sex therapist. She received her Bachelor's degree in Pyschology from the University of Oregon, and her Master's and Ph.D. from Columbia University. Her Ph.D. is in the field of psychology, marriage and family education. She is a licensed psychologist in New York State and certified in Massachusetts.

She belongs to the following professional organizations and associations: the American Association of Marriage and Family Life Counsellors; the Society for the Scientific Study of sex; the American Psychological Association; the International Psychological Association; and the American Society of Clinical Hypnosis.

Dr. Hamilton has written books in the field of sex, among them: "Sex Be-

at 72), the court was thus "exposed to opinions and made to think about whether the 'dominant' theme is an appeal to 'prurient interests' and, if so, to what groups; whether material is 'patently offensive' because it affronts 'contemporary' and national standards relating to the description of sexual matters; and whether the material is 'utterly without redeeming social value?'" *Id.* With such fixations paramount, the court thus by-passes the "I know it when I see it" test referred to by Justice Stewart, concurring in Jacobellis v. Ohio, 378 U.S. 184, 197, 84 S.Ct. 1676, 12 L.Ed.2d 793 (1964). Adverting to the foregoing, however, it must also be said that the testimony of experts is not to displace the court in determining the ultimate question of obscenity of the film. *See* Smith v. California, 361 U.S. 147, 165, 80 S.Ct. 215, 4 L.Ed.2d 205 (1964) (Frankfurter, J., concurring).

As to the first test (appeal to prurient interest), the Court said in *Roth* that "[o]bscene material is material which deals with sex in a manner ap-

---

fore Marriage", and "Partners in Love", as well as about sixty articles, mostly for "Modern Bride Magazine", dealing with "how to love more effectively". She has given numerous lectures and presented seminars on the subject of sex. In addition, she spends most of her time engaged in private counselling on sex and sex-related problems.

2) *Reverend Ronald Mazur*

Reverend Ronald Mazur is a health educator for the University Health Services at the University of Massachusetts, Amherst. His primary function at the University of Massachusetts deals with sex education. His job is described as "to train college students to be educators and counsellors to other college students in their residential areas. He received his Bachelor's degree in both Psychology and Philosophy from Boston University. He also holds a Bachelor of Divinity Degree from Harvard Divinity School. His professional work experience includes an aggregate of twelve years in the Unitarian-Universalist ministry. After leaving the parish, he spent two years with a private practice called Sex Education Consulting and Counselling Services in Salem, Massachusetts. He has also done private sex counselling with individuals, couples, small groups and workshops. He has done research in sex education and published a book "Common Sense Sex". Another book "The New Intimacy" is soon to be published. Reverend Mazur has also published numerous articles in the fields of psychology, theology and sex education.

Reverend Mazur belongs to the following professional associations: the Unitarian-Universalist Ministers Association, the National Council on Family Relations, the American Association of Sex Educators and Counsellors, and the Society for Scientific Study of Sex.

3) *John W. Money, Ph.D.*

Dr. Money is a Professor of Medical Psychology and an Associate Professor of Pediatrics at John Hopkins Medical School. Dr. Money graduated from the University of New Zealand with two Master's degrees, and received his Ph.D. from Harvard University.

Since 1951, Dr. Money has been working in the general field of medical psychology and specifically in the field of children with sexual and glandular disorders. His special work is in psychological matters of the behavioral development of such children.

About one-third of Dr. Money's time each week is spent counselling "normal" people with regard to their particular problem in the sexual field.

He belongs to the following professional societies and associations: the Pediatric Endocrine Society, the Pediatric Psychological Society, the American Association for the Advancement of Science, the International Association on Reproduction, the Royal Society of Medicine, the Society for the Scientific Study of Sex, the Behavior Genetic Sex Association, the German Sexual Research Association and others.

Dr. Money has writtten two books: "Sex Errors of the Body", and "Man and Woman, Boy and Girl". He also edited two books: "Contemporary Sexual Behavior", and "Sex Research, New Developments". He also has written about 180 scientific and medical papers, and about 30 papers for chapters in textbooks, reviews and articles. Generally, the papers dealt with how males and females develop their gender activity and their sexual behavior, the function of the visual image in sexual arousal, and the use of visual erotica in the sex education of physicians.

pealing to prurient interest". 354 U.S. at 487, 77 S.Ct. at 1310. Prurience in the portrayal of sex is equated with "material having a tendency to excite lustful thoughts", "lascivious desire or thought". *Id.* at 487, n.20, 77 S.Ct. at 1310. The material is to be adjudged obscene if "to the average person . . . the dominant theme of the material taken as a whole appeals to prurient interest". *Id.* at 489, 77 S.Ct. at 1311.

■ The "patently offensive" criterion depends upon the national community standards. In *Palladino* Judge Coffin noted that "[n]ational standards are, to say the least, elusive beasts. A determination of whether a document exceeds the national level of tolerance requires some exposure not just to publications of national or broad regional scope, but also to the views, attitudes, habits and tastes of other communities with different climates, cultures, and histories". 475 F. 2d at 73.

It is pointed out in Memoirs v. Massachusetts, 383 U.S. 413 at 419, 86 S.Ct. 975 at 978, 16 L.Ed.2d 1 (1966) that "the social value of the [material] can neither be weighed against nor canceled by its prurient appeal or patent offensiveness", but is to be applied independently. Justice Brennan said in Jacobellis v. Ohio, 378 U.S. 184 at 191, 84 S.Ct. 1676 at 1680, 12 L.Ed.2d 793: ". . . material dealing with sex in a manner that advocates ideas . . . or that has literary or scentific or artistic value or any other form of social importance, may not be branded as obscenity and denied the constitutional protection". In determining whether the treatment and portrayal of sex in any materials has social value we are reminded by *Roth* that "Sex, a great and mysterious motive force in human life, has indisputably been a subject of absorbing interest to mankind throughout the ages". 354 U.S. at 487, 77 S.Ct. at 1310.

### III

Taking account of the *Roth-Memoirs* tests, and giving weight to the reliable and persuasive evidence, the court turns to the film itself. "Deep Throat" portrays sexuality utterly devoid of any interpersonal feeling of warmth, love, tenderness or emotion. The personal relationships depicted are shed of all amenities of social humanity, and are decadent. A series of sex-for-sex's-sake relationships, heavy in repeated episodes of fellatio embellished and heightened by the camera work in close-ups, is the major thrust of the film. The flimsy story line, not found convincing by any witness, is nothing more than a charade, and the facade to mask the clear purpose of the film-maker, that is, the presentation of blatant sex exhibitions seemingly without more. In no sense can "Deep Throat" be viewed as comedy, and the watery thin attempt at humor adds nothing to the experience of the human character or condition. The acting falls far short of any standard or quality tending to portray plot or character development, or an understanding of human nature.

There was testimony from witnesses called by the claimant that "Deep Throat" had both entertainment and educational value. On those points the testimony was characteristically unpersuasive. It strains the bounds of credulity too much (for the film omits only the scatological) to accept seriously an appraisal of "Deep Throat" as a story of tragicomic disparity between the female star's sexual yearning and attaining, or as a portrayal of her as an allegorical figure (poetic or otherwise) representing the plight of women unable to achieve sexual gratification, or as a step forward in the women's liberation movement.

■■ The range of educational value of "Deep Throat" claimed by these witnesses again leaves the court unpersuaded. The enormous visual impact of this film, exhibited in a darkened commercial movie house, on an audience composed of adults who have freely chosen to present themselves for exposure to the film could not realistically provide the educational accompaniment for a process of learning,

as one of the witnesses contended, for college students or high school students. If the film is to be used for some purported educational or therapeutic purpose, those who would solely so use it might arguably assert their right to do so in a non-commercial use setting. It does not suffice to say, however, that because a film may be a proper vehicle for educating A under clinical conditions as to sexual techniques or sexual problems, it must therefore be judged non-obscene as to B, and to others, when shown in a public theatre. Nor does it suffice to say that because "Deep Throat" is said to create new frontiers for sexual explicitness, because it dares to challenge the accepted ways of portraying sex in the movies, or because it tends to break down "taboos" about oral-genital sex and anal sodomy, that it is thereby endowed with some redeeming social value. Concededly there is widespread interest in sex today from the physiological and psychological viewpoints, yet this film does not seriously seek to examine sexual difficulties, sexual problems, or the effect of sex on human relationships. Ideas about sex are not presented in the film, only the raw portrayals of the acts themselves. Whatever claim of artistry the maker and producer may assert for the film, it is not art.

Whatever claims may be made about "Deep Throat", it was designed to have an impact only through the sexual scenes. These dominate the film in tedious succession, and tend to arouse a prurient interest in sex. To some extent this latter fact was conceded by experts called by the claimant. The presentation exceeds the permissible limits of candor in the portrayal of sexual explicitness in films, not merely as it may be judged by the prevailing secular ethic throughout the country, but by the judgment of certain of the witnesses called by the claimant.

Finally, it is well to note that censorship is not an issue in this case. Most if not all the witnesses appeared to be aware of this. Professor Lord, called by the Government, stated that he was "absolutely opposed to any form of censorship," and he was therefore troubled when requested to give evidence in this case. He testified that he resolved the dilemma as follows: "[I]t does seem to me that there is a law which we are asked to consider, and, therefore I am very much prepared to give evidence because if one doesn't, one is faced with anarchy. So having struggled with this somewhat remote moral question, I feel I can approach the whole subject . . . ."[5]

Thus, the court reaches the conclusion that the dominant theme of the film, taken as a whole, appeals to a prurient interest in sex; that the film is patently offensive in that it affronts contemporary community standards with respect to description and representation of sexual matters; and that it is utterly without redeeming social value. It is therefore obscene and not protected by the Constitution.

Accordingly, judgment shall enter for the Government, and the film may be forfeited pursuant to the statute.

---

5. *See* McDowell, The Critics of Pornotopia, Wall St.J., May 15, 1973, at 24, col. 3. Mr. McDowell stated:

The burden of the new criticism is that unless artists, critics and the general public exercise restraint, unless they put those moral chains upon their appetite that Burke said were necessary to make self-government work, pressure will grow for governments to impose chains.

Yet self-restraint is less and less likely as long as intelligent people find redeeming social values in "Deep Throat", or so long as opinion leaders refuse to consider the moral implications of pornotopia.

The celebration of pornography ineluctably debases and corrupts art, but the new critics say the greater danger is that it corrupts the human spirit. That is why even those who are uneasy about censorship are strongly in favor of censureship, in bringing the full weight of moral condemnation to bear on those who wallow for profit or pleasure in the swamplands of smut.