MILKY WAY PRODUCTIONS, INC.,
et al., Plaintiffs,

v.

Howard R. LEARY et al., Defendants.

NEW YORK FEED CO., Inc., et al.,
Plaintiffs,

v.

Howard R. LEARY et al., Defendants.

Nos. 69 Civ. 3638, 3808.

United States District Court
S. D. New York.

Oct. 15, 1969.

Judgment Affirmed Feb. 27, 1970.
See 90 S.Ct. 817.

Ralph J. Schwarz, Jr., New York City, for plaintiffs Milky Way Productions, Inc., and another.

Herald Price Fahringer, Buffalo, N. Y., for plaintiffs New York Feed Company, Inc., and another.

J. Lee Rankin, Corporation Counsel of the City of New York for defendant

Howard R. Leary; Irving Gerstman, Brooklyn, N. Y., of counsel.

Frank S. Hogan, Dist. Atty. of New York County, pro se; Michael R. Juviler, Herman Kaufman, Asst. Dist. Attys., of counsel.

Louis J. Lefkowitz, Atty. Gen. of the State of New York; Charles A. LaTorella, Jr., Asst. Atty. Gen. of the State of New York, of counsel.

Before FEINBERG, Circuit Judge, and MURPHY and FRANKEL, District Judges.

FRANKEL, District Judge.

This three-judge court has been convened to consider applications for injunctive and other relief by plaintiffs in two consolidated cases who assert that their rights under the First Amendment, as it applies via the Fourteenth, are being infringed by state arrests and prosecutions on obscenity charges.

In one case plaintiffs are Milky Way Productions, Inc., and two of its officers, engaged in publishing a weekly tabloid called "Screw, The Sex Review." The other suit is brought by New York Feed Company, Inc., and Stephen Heller, who publish a bi-weekly tabloid entitled "The New York Review of Sex & Politics." Defendants in both cases are Howard R. Leary, Police Commissioner of New York City, and Frank S. Hogan, New York County District Attorney.

The publishers of "Screw," in their complaint filed August 18, 1969, charge that defendants, in May of 1969, "embarked upon a plan and series of acts the purpose and effect of which has been to suppress the public sale of several issues of subject tabloid newspaper and to deprive the public of its right to read the tabloid and now threatens to suspend completely the publication and dissemination of subject tabloid." Specifically, it is charged, plaintiffs Goldstein and Buckley were arrested in May and charged with violating New York Penal Law, McKinney's Consol.Laws, c. 40,

§ 235.05 [1] by promoting Issues No. 14 and No. 15 of "Screw." Thereafter, the complaint continues, the plaintiffs were advised by their counsel that "the only real basis to justify the arrests" was found in certain pictures, and they "proceeded in subsequent Issues to eliminate those pictures which apparently were deemed or appeared to be most objectionable."

Nevertheless, it is alleged, Goldstein and Buckley were arrested again on June 26, 1969, again on charges under § 235.05, because of their Issue No. 17. At the same time, "the distributor and several newsdealers" were arrested for promoting this issue. Moreover, plaintiffs charge, since May 21 "defendants, and particularly members of the Police Department, told, advised and threatened newsdealers and others that they would be arrested for selling any Issue of the publication Screw, including, of course, Issue No. 18 which was not subject to any process, civil or criminal."

As a result of these official actions, plaintiffs allege, sales of their Issues 18 and 19 have dropped from a former level of 75,000 to about 17,000. And this has happened, they say, even though "defendants * * * are or should be fully aware that Issues No. 17, 18, 19, 20 * * * did not and do not contain pictures falling within the definition of hard-core pornography, to wit: pictures showing a consummated sexual act."

The complaint goes on to allege "still further arrests" on August 15, 1969, for promoting Issues 22 through 24.

According to the complaint, defendants have been asked, but have refused, to employ alternative procedures, such as civil injunctions or informal advance consultations with plaintiffs, in lieu of criminal charges under the obscenity statute.

As a result of the acts alleged, plaintiffs say, their business is being destroyed and First Amendment freedoms are being chilled. Allegedly lacking any other adequate remedy, they seek (in addition to damages) injunctive and declaratory relief of kinds, and on grounds, more particularly stated below.

Plaintiffs in the second case, publishers of "The New York Review of Sex & Politics," plead a similar cause, with some variations. On June 20, 1969, they allege, plaintiff Heller, "among others," was charged with violating Penal Law § 235.05 on the basis of the "Review's" Issue No. 9. In addition to Heller, Alvin Druss, principal of a distributing company, and "a number of newsstand dealers" (not named) are alleged to have been arrested. Circulation of the "Review" has dropped from 40,000 to 30,000. 193 newsstands carried it before June 20, but the number has since decreased to about 75. It is alleged that Heller was arrested again on August 15, 1969, this time for Issue No. 12 of the "Review." On this occasion, it is alleged, "some 70 or less [sic [2]] newsstand dealers, some of whom are blind, others who are handicapped and disabled," were also arrested. Unlike the complaint about "Screw," that concerning the "Review" makes much of the allegedly "tasteful" and otherwise valuable aspects of the publication, but this dubiety turns out to have little or no significance for purposes of the questions before us.

The alleged pattern of arrests, said to be pursued "recklessly and promiscuously," is assailed as an "effective prior restraint" forbidden by the Federal Constitution. Moreover, plaintiffs allege, with arrests being made before there has been an adversary ruling on obscenity, "defendants are acting in bad faith in that they are attempting to accomplish, and are in fact accomplishing,

1. "A person is guilty of obscenity when, knowing its content and character, he * * * [p]romotes, or possesses with intent to promote, any obscene material * * *." Effective September 1, 1969,

the statute was amended in minor respects not pertinent here.

2. The affidavits hereinafter discussed suggest that the word "less" pushes the approximation toward accuracy.

by extra judicial means what could not be achieved if the legal processes were followed." As in the companion case, plaintiffs connected with the "Review" seek both damages and injunctive relief.

By motions returnable on September 16, 1969, both sets of plaintiffs have applied for relief *pendente lite*. While the motions are not identical, the sum total of the relief sought and the contentions raised by both may be outlined as follows:[3]

(1) Temporary injunctions are sought

 (a) to forbid arrests unless there has first been an adversary hearing before a judicial officer to determine whether the publications in question are obscene;

 (b) to require that defendants negotiate and "pinpoint" alleged qualities of obscenity before instituting criminal proceedings;

 (c) to forbid threats of arrest or warnings by police officers to newsdealers that sale of the publications will or may lead to arrest.

(2) Declaratory rulings are requested invalidating N.Y. Penal Law § 235 in several respects hereinafter detailed.

(3) Likewise, a declaration is sought that §§ 148–150 of New York's Code of Criminal Procedure are unconstitutional facially and as applied because they assertedly allow suppression of publications as "contraband" without a prior adversary hearing, contrary to the claimed protections of the First and Fourteenth Amendments.

(4) The convening of a three-judge court is urged—successfully, as this opinion indicates.

Defendants for their part have been permitted to cross-move for dismissal of the complaints, plaintiffs having waived the normal notice requirements.

In the papers filed for and against the motions, the broad outlines of the complaints are retraced, but with some notable modifications and additions. The alleged dates of arrests and the affected issues of the two publications are confirmed in the affidavits. The total of arrests appears to be sharply diminished; despite the bland assertion of undocumented numbers in plaintiffs' papers (with no detail and no ultimate weight even as affidavits go), we are able to find not more than 13 arrests for all affected issues of "Screw" and 5 for the affected issues of the "New York Review."

As against the complaint allegations that plaintiffs are being crushed by delayed vindication of their First Amendment rights, it has been shown without dispute that plaintiffs have acquiesced since May and June in the postponement of the pending state criminal proceedings. They have neglected during a summer and beyond to press for their right to speedy state adjudications or even to raise in the state courts the issues of constitutional law they want this court to decide.

Upon the foregoing facts, for reasons which follow, we have concluded that plaintiffs' motions must fail but that their complaints, if only narrowly, should survive defendants' motions to dismiss.

## I

 Assuming in plaintiffs' favor a negative answer to the question whether 28 U.S.C. § 2283 [4] applies to cases like

---

3. Neither plaintiff joins in all the arguments or prayers of the other. The "Review" plaintiffs, for example, did not move initially for declaratory relief. The "Screw" plaintiffs have not joined in the attack upon the statutory presumptions, considered under "IV," *infra*. It simplifies things a little, however, and harms no one, to cumulate the several subjects in a single summary and treat them *seriatim* later on.

4. "A court of the United States may not grant an injunction to stay proceedings in a State court except as expressly authorized by Act of Congress, or where necessary in aid of its jurisdiction, or to protect or effectuate its judgments."

this one, cf. Dombrowski v. Pfister, 380 U.S. 479, 484 n. 2, 85 S.Ct. 1116, 14 L.Ed. 2d 22 (1965); and see 208 Cinema, Inc. v. Vergari, 298 F.Supp. 1175, 1178 (S.D. N.Y. 1969), appeal pending, no sufficient case is made for an injunction. To begin with, plaintiffs' claim founders because they cannot show the extraordinary need required to justify such rare interferences with state criminal processes. Their heavy burden is to demonstrate that this is one of the "exceptional cases" where this kind of relief is essential "to prevent irreparable injury which is clear and imminent * * *." Douglas v. City of Jeannette, 319 U.S. 157, 163, 63 S.Ct. 877, 881, 87 L.Ed. 1324 (1943); and see cases collected in Richardson v. Dudley, 295 F.Supp. 181, 185 (S.D.N.Y.1969) (three-judge court). The burden is not met by plaintiffs such as these who have had an available state forum for their claims over a period of three or four months, have been entitled to speedy adjudications in that forum, Freedman v. Maryland, 380 U.S. 51, 85 S.Ct. 734, 13 L.Ed.2d 649 (1965), and have chosen simply to bypass that avenue of relief in favor of seeking federal intervention.[5] If such delay and disregard of state processes pending the arrival of self-inflicted "emergencies" could meet the test for a federal injunction, the abrasive device would promptly lose its "exceptional" character and would become a commonplace irritant.

Apart from the problem of fatal delay, plaintiffs' prayer for an injunction lacks the central element of Dombrowski, the basic case they invoke—namely, a substantial indication of "bad faith" in the pending state prosecutions. See Cameron v. Johnson, 390 U.S. 611, 619, 88 S.Ct. 1335, 20 L.Ed.2d 182 (1968); id. at 623, 88 S.Ct. (dissent); Robinson v. Bradley, 300 F.Supp. 665, 667 (D. Mass. 1969) (three-judge court). While there is a passing allegation of "bad faith" in the moving papers for "Screw" (Schwarz affidavit at 8), and the same phrase appears in the "Review" complaint (par. 34), the plaintiffs consistently deny that they must show "bad faith" prosecution. It is evident, moreover, that their use of the quoted words has a special and inapposite meaning—to describe the omission of adversary proceedings before arrest, which is a separate subject to be considered below.

■■ In any event, the requisite bad faith has not been shown. In fact, beginning with the prosecutions of the "Screw" people in May, the papers and the oral submissions give a convincing picture of careful, discriminating prosecutions in *good faith*. Counsel have been enormously circumspect on the subject, but the strong inference from what they do say is that the copies of "Screw" underlying the May charges closely approached the badlands of "hard-core pornography." [6] Similarly, there is nothing

---

5. Plaintiffs do not show inadequacy of the state procedures in any material sense. Cf. Potwora v. Dillon, 386 F.2d 74 (2d Cir. 1967). They say that vindication of their attacks upon the state statutes in the pending criminal cases will not serve to terminate or prevent other prosecutions. In the absence of a demonstration that defendants would persist in proceeding upon invalidated statutory premises, we should not and will not assume it. This is sufficient answer even apart from our doubts that the state scheme of remedies is as barren as plaintiffs say it is.

6. Tying this to their argument that the prosecution ought to arrange a system of advisory opinions, plaintiffs in the *Milky Way* case tell us they realized

there were pictures in the May issues which could lead a good-faith prosecutor to a determination of hard-core pornography. This was remedied, plaintiffs tell us. They proceed then to submit copies of the later, supposedly "purified" issues, which have also led to prosecutions, but none of the May numbers. The later items before us, whether "obscene" or not (which we are not asked to decide), contain noticeable amounts of naked people, flaunted genitalia, and suggestive postures, all in an environment of sophomoric smut that somebody may have thought to reflect liberated sophistication. Anatole France may not have deserved the stricture, but Mr. Justice Holmes would not even have wasted on this stuff the observation that this "sex talk has none of the charm of

beyond bald assertion to indicate that defendants have brought charges or made arrests based on issues of the "Review" while knowing their accusations could not be sustained.[7]

■ This leaves the prayer for declaratory relief, a distinct subject under cases like Zwickler v. Koota, 389 U.S. 241, 88 S.Ct. 391, 19 L.Ed.2d 444 (1967), and Cameron v. Johnson, 390 U.S. 611, 88 S.Ct. 1335, 20 L.Ed.2d 182 (1968). The cited decisions indicate that declaratory relief may be available even if an injunction is not where non-frivolous claims of vagueness or overbreadth are lodged against a statute touching First Amendment freedoms. Even those decisions, however, leave largely intact the long-standing principle that "[a] declaratory judgment, like other forms of equitable relief, should be granted only as a matter of judicial discretion, exercised in the public interest." Eccles v. Peoples Bank, 333 U.S. 426, 431, 68 S.Ct. 641, 644, 92 L.Ed. 784 (1948), quoted in Public Affairs Associates v. Rickover, 369 U.S. 111, 112, 82 S.Ct. 580, 7 L.Ed.2d 604 (1962). There is no indication that every issue in a state proceeding affecting areas of First Amendment concern is an automatic candidate for duplicative and potentially conflicting decision in a concurrent federal suit for declaratory relief.[8]

■ In an effort to harmonize the general principles of discretion with the special forms of First Amendment protection implemented by Zwickler and Cameron, we conclude that the subjects of vagueness and overbreadth—available to any suitor within the seeming reach of the state enactment, N.A.A.C.P. v. Button, 371 U.S. 415, 432, 83 S.Ct. 328, 9 L.Ed.2d 405 (1963); Thornhill v. Alabama, 310 U.S. 88, 97–98, 60 S.Ct. 736, 84 L.Ed. 1093 (1940); Winters v. New York, 333 U.S. 507, 518–520, 68 S.Ct. 665, 92 L.Ed. 840 (1948)—are permissible for declaratory relief. Cf. Robinson v. Bradley, supra, 300 F.Supp. at 669. On this thesis, we will render a declaration on the subject covered under Point II, infra (facial unconstitutionality of Penal Law § 235). For comparable reasons, we reach the claimed right to an adversary hearing before arrest (Point III, infra), but not the complex mix of fact and law involved in the contention that the presumptions in Penal Law § 235.10 must be deemed "irrational" and therefore unconstitutional (Point IV).

## II.

The substantive portions of Penal Law § 235 are attacked on three grounds, all of which we hold to be mistaken.

(1) The main claim is that the definition of "obscene" in § 235.00(1) is invalid on its face because it embodies only the three "tests" set out in Memoirs v. Massachusetts, 383 U.S. 413, 418, 86 S.Ct. 975, 16 L.Ed.2d 1 (1966), as derived

really felt lubricity." 1 Holmes-Laski Letters 414 (Howe ed., abr., Atheneum 1963). Since we have not been told in September what was in the admittedly lustier pages of May, we find no joy or utility in guessing. It is enough that the whole picture reflects nothing to suggest the "hopeless" prosecution solely for harassment which is the essence of Dombrowski-style bad faith.

7. Further claims for injunctive relief have been noted and found frivolous, at least on the showing now before us. The alleged pattern or scheme of "threats" is not even adumbrated by the scattered (and disputed) instances reported by affiants who appear to have been soliciting the assertedly repressive remarks. The contention that prosecutors must consult or negotiate before bringing obscenity charges—whether or not the idea might point toward a useful form of collaboration—is without basis in constitutional law.

8. It should be mentioned that both Zwickler and Cameron may well be distinguishable in that neither involved long-pending state proceedings like the ones here. In Zwickler there was no pending state case at all, but only a decision reversing a conviction on state grounds and leaving the problem under the Federal Constitution unresolved. In Cameron state arrests on April 10, 1964, were followed by filing of the federal suit three days later. 390 U.S. at 615, 88 S.Ct. 1335.

from Roth v. United States, 354 U.S. 476, 77 S.Ct. 1304, 1 L.Ed.2d 1498 (1957), and intervening cases. Two more "tests," plaintiffs assert, were added by Redrup v. New York, 386 U.S. 767, 87 S.Ct. 1414, 18 L.Ed.2d 515 (1967)— that there be "pandering" and "foisting upon an unwilling public."

█ Plaintiffs misread the *per curiam* opinion in *Redrup*. As shown by the fuller opinions from which they derive, the supposedly additional, and allegedly essential, "tests" are only *permissible* kinds of relevant *evidence* which may serve in a close case to tip the balance toward a finding of obscenity. The basic thought appears first in separate opinions of Chief Justice Warren. See *Roth*, 354 U.S. at 495, 77 S.Ct. 1304 (concurring opinion); Jacobellis v. Ohio, 378 U.S. 184, 201, 84 S.Ct. 1676, 12 L.Ed.2d 793 (1964) (dissent). It takes firmer root in the opinion of Mr. Justice Brennan (joined by the Chief Justice and Mr. Justice Fortas), delivering the Court's judgment in *Memoirs, supra,* where he said (383 U.S. at 420, 86 S.Ct. at 978):

> "On the premise, which we have no occasion to assess, that *Memoirs* has the requisite prurient appeal and is patently offensive, but has only a minimum of social value, the circumstances of production, sale, and publicity are relevant in determining whether or not the publication or distribution of the book is constitutionally protected. Evidence that the book was commercially exploited for the sake of prurient appeal, to the exclusion of all other values, might justify the conclusion that the book was utterly without redeeming social importance."

The idea reaches full bloom with Mr. Justice Brennan's majority opinion in Ginz-

burg v. United States, 383 U.S. 463, 470–473, 86 S.Ct. 942, 16 L.Ed.2d 31 (1966) (evidence of "pandering is relevant to the application of the *Roth* test"—*id.* at 471, 86 S.Ct. at 947).[9]

Nothing in *Redrup* changes the scope or effect of these added "tests." There is no support in that or any other decision of the Supreme Court for the view that they must be satisfied *in addition* to the three tests of *Memoirs* before a finding of obscenity is permissible. The standard as laid down in *Memoirs* was cited with approval as recently as Stanley v. Georgia, 394 U.S. 557, 568, 89 S.Ct. 1243, 22 L.Ed.2d 542 (1969). For a view of the precedents similar to ours, see United States v. 77 Cartons of Magazines, 300 F.Supp. 851, 853–854 (N.D. Cal. 1969).

It bears mention, however, that plaintiffs are not alone in their contrary thinking. In United States v. 4,400 Copies of Magazines, Etc., 276 F.Supp. 902 (D.Md. 1967), the five Judges of the District of Maryland, sitting *en banc,* unanimously ruled for the claimant in a condemnation case under section 305 of the Tariff Act of 1930, 19 U.S.C. § 1305, on the explicit ground that *Redrup* has added cumulative, and therefore narrowing, "tests" of obscenity. While it found the magazines before it the lewdest it had ever considered, appealing more blatantly than any before to prurient interest, and devoid of social value, the Court held it impossible to sustain forfeitures for obscenity. Explaining what it saw as the decisive impact of *Redrup*, the Court said (at 904):

> "It appears * * * that persons to whom the magazines will be offered commercially, and the methods by which they will be offered, are factors to be considered in determining wheth-

9. Mr. Justice Harlan, dissenting in *Ginzburg*, read the "majority views" on "the panderer test * * * as constitutional doctrine" rather than "a statutory gloss * * *." *Id.* at 494, 86 S.Ct. at 954. His analysis does not help the plaintiffs here. The effect of the doctrine as he saw it (*id.*) was to provide an avenue

toward a finding of obscenity which would otherwise not exist. He found it serving, in other words, to narrow, not broaden, the area of First Amendment protection. There is no basis for a position that state legislatures are required to incorporate such restrictive approaches in their statutes regulating obscenity.

er their dissemination is protected by the First Amendment.

"Since the magazines involved in the present case have not yet been admitted into the United States, we cannot be sure how they will be marketed—(a) whether they will be sold to juveniles, either by mail solicitation or over the counter, (b) whether they will be offered for sale in a manner so obtrusive as to make it impossible for an unwilling individual to avoid exposure to them, and (c) whether they will be offered for sale in a manner which will amount to pandering.

"This Court is, therefore, of the opinion that it cannot order the condemnation and forfeiture of these magazines at this time. On the other hand, this Court is of the opinion that if the magazines involved in this case are sold to juveniles, or are offered for sale in a manner so obtrusive as to make it impossible for an unwilling individual to avoid exposure to them, or if they are offered for sale in a manner which amounts to pandering within the principles stated in Ginzburg v. United States, 383 U.S. 463 at 465–466, 467, 470–471, 474–476, 86 S.Ct. 942, 16 L.Ed.2d 31, they would not be entitled to the protection of the First Amendment. See Donnenberg v. State, 1 Md.App. 591, 232 A.2d 264, 271 (1967)."

See, likewise, United States v. 127,295 Copies of Magazines, etc., 295 F.Supp. 1186, 1188–1189 (D.Md.1968) (Thomsen, C. J., and Northrop, J.) ; and see Grant v. United States, 380 F.2d 748 (9th Cir. 1967) ; Poulos v. Rucker, 288 F.Supp. 305, 307 (M.D. Ala. 1968) (interpreting *Redrup,* and the reversals without opinion in its wake, "as indicating that it is indeed a rare book that, solely on the basis of its content, is not entitled to constitutional protection").

Having attended respectfully to the apparent holdings in the Maryland District Court and the somewhat parallel

observations elsewhere, we adhere to the position that the New York statute survives the opinion in *Redrup.*[10]

▪▪ (2) We can give shorter shrift to the argument that the New York State Legislature was bound to limit its proscriptions to "hard-core pornography" after the decision in People v. Richmond County News, 9 N.Y.2d 578, 216 N.Y.S. 2d 369, 175 N.E.2d 681 (1961), which so confined the statute then in effect. The Federal Constitution nowhere commands any such state judicial supremacy. The States are free, of course, by whatever organs they choose, to give wider freedom for expression than the First and Fourteenth Amendments require. See Mishkin v. New York, 383 U.S. 502, 507–508, 86 S.Ct. 958, 16 L.Ed.2d 56 (1966) ; Paulsen, State Constitutions, State Courts, and First Amendment Freedoms, 4 Vand.L.Rev. 620, 642 (1951) ; cf. Johnson v. New Jersey, 384 U.S. 719, 733, 86 S.Ct. 1772, 16 L.Ed.2d 882 (1966). They are not perpetually bound by experiments in that direction.

▪ (3) The attack upon § 235 as void for vagueness is frivolous. Roth v. United States sustained the bare word "obscene" against a similar assault. See 354 U.S. at 491–492, 77 S.Ct. 1304. New York's detailed definition renders its statute more clearly impregnable.

### III.

The argument that there must be an adversary hearing before an arrest for obscenity is made in two forms: (1) as an attack on N.Y.Code Crim.Proc. §§ 148–150, an asserted subject for three judges, and (2) as a simple claim of official lawlessness, cognizable by one judge. Version No. (1) invites us to an area that "abounds with slippery distinctions," Wright, Federal Courts 164 (1963)—namely, "between a petition for an injunction on the ground of the unconstitutionality of the statute as applied, which requires a three-judge court, and a petition which seeks an injunction on

---

10. At the same time, we find enough in the way of utterly respectable disagreement to reject defendants' plea that this three-judge court be dissolved because no question of sufficient substance justified its convening.

the ground of the unconstitutionality of the result obtained by the use of a statute which is not attacked as unconstitutional. The latter petition does not require a three-judge court." Ex parte Bransford, 310 U.S. 354, 361, 60 S.Ct. 947, 951, 84 L.Ed. 1249 (1940). In the view we have taken, since there is three-judge jurisdiction on other grounds (see note 10, *supra*), we need not wade into this morass. See Florida Lime Growers v. Jacobsen, 362 U.S. 73, 80–81, 84, 80 S.Ct. 568, 4 L.Ed.2d 568 (1960), and cases there cited. Accordingly, we can and do go directly to the asserted requirement of a preliminary adversary hearing and decide the essentially identical question under either formulation—whether such a novelty is mandated by the First Amendment.

■ While what plaintiffs propose is indeed a relative "novelty," their argument is not without arguable connection to established principles. Plaintiffs rely upon the decisions which have condemned mass, or broadly effective, seizures of allegedly obscene writings without a prior adversary hearing. A Quantity of Books v. Kansas, 378 U.S. 205, 84 S.Ct. 1723, 12 L.Ed.2d 809 (1964); Marcus v. Search Warrant, 367 U.S. 717, 81 S.Ct. 1708, 6 L.Ed.2d 1127 (1961); Bethview Amusement Corp. v. Cahn, 416 F.2d 410 (2d Cir. 1969); Tyrone, Inc. v. Wilkinson, 410 F.2d 639 (4th Cir. 1969); Metzger v. Pearcy, 393 F.2d 202 (7th Cir. 1968). A "prior restraint" is also effected, plaintiffs say, when arrests are made—particularly multiple arrests for promoting the same publication—because this inhibits others from continuing to distribute the materials. And so, the argument concludes, there must be an adversary hearing and judicial determination preceding the inception of the criminal process.

The argument is not merely plausible; it has won approval in several courts. Delta Book Distributors v. Cronvich, Inc., 304 F.Supp. 662 (E.D.La. 1969) (three-judge court); Cambist Films, Inc. v. State of Illinois, 292 F. Supp. 185 (N.D.Ill. 1968); Sokolic v. Ryan, 304 F.Supp. 213 (S.D.Ga., 1969).[11] But decisions we believe to be sounder, at least in the present state of learning, go the other way. Tyrone, Inc. v. Wilkinson, 410 F.2d 639 (4th Cir. 1969); Rage Books, Inc. v. Leary, 301 F.Supp. 546 (S.D.N.Y. 1969), appeal pending; Astro Cinema Corp., Inc. v. Mackell, 69 Civ. 778 (E.D.N.Y., 8–19–69); The East Village Other, Inc. v. Koota, 68 Civ. 125 (E.D.N.Y. 2–13–68). In the respect here pertinent, we join the latter group.

It is of interest in this connection, if by no means decisive, that plaintiffs' theory, if accepted, would have invalidated both federal and state convictions under obscenity statutes which have in the recent past been upheld by the Supreme Court. Ginsberg v. New York, 390 U.S. 629, 88 S.Ct. 1274, 20 L.Ed.2d 195 (1968); Mishkin v. New York, 383 U.S. 502, 86 S.Ct. 958, 16 L.Ed.2d 56 (1966); Ginzburg v. United States, 383 U.S. 463, 86 S.Ct. 942, 16 L.Ed.2d 31 (1966). A point of greater importance, both as a matter of legal history and practical judgment, is the fact that the prior adversary proceeding plaintiffs demand would not serve to eliminate either the "'chill" or the "prior restraint" against which they contend. It does not appear that there were any arrests in the present cases before a judicial officer had scrutinized the materials and determined that warrants should issue. All that, like the proceedings of a grand jury, was accomplished *ex parte*—without either the possible benefit to the accused or the potentially "chilling" effect upon others of adversary proceedings. The result, at least

---

11. Each of the cited cases is distinguishable from ours in that each involved arrests coupled with seizures of allegedly obscene material. No seizures occurred in the cases before us. Nevertheless, as is highlighted by Judge Rubin's partial dissent addressed to this aspect of the *Delta Book Distributors* case, the court in each instance was persuaded to enjoin further criminal proceedings in addition to granting separable relief from the unlawful seizures.

in terms of history, is to avoid any traditional form of "prior restraint" because the first overt impact upon the allegedly protected area comes at a time when all the protections and favorable presumptions of the criminal process are available to the defendant. Cf. Near v. Minnesota, 283 U.S. 697, 713–714, 51 S.Ct. 625, 75 L.Ed. 1357 (1931).

This is not to blink at the undeniable fact that arrests and prosecutions are likely to deter activities of the kind against which they are directed. The very existence of criminal sanctions for forms of expression, especially when the standards of liability are such vexed questions at the highest judicial levels, must have some appreciable tendency of the same type. See Smith v. California, 361 U.S. 147, 154–155, 80 S.Ct. 215, 4 L.Ed.2d 205 (1959). The point remains that the inhibitions are not avoided by the new procedure plaintiffs want; they are, if anything, pushed back to an earlier time of open contest when the burden of litigation and a species of readier "defeat" are likely to work their deterrent effects.

It is inappropriate, we think, to "weigh" (assuming we could) the relative impact of familiar criminal procedures against the innovation plaintiffs seek. It seems sufficient for our purposes that the supposed virtues of the departure they urge are not at all apparent and are directly antithetical to all pertinent indications in the Supreme Court's pronouncements implementing the First Amendment. The net effect of those expressions suggests that traditional criminal prosecutions, with their procedural safeguards, are surely permissible, and very possibly preferred, vehicles for enforcing bans against obscenity. See Bantam Books, Inc. v. Sullivan, 372 U.S. 58, 69–70, 83 S.Ct. 631, 9 L.Ed.2d 584 (1963); Id. at 72–73, 83 S.Ct. at 640–641 (Douglas, J., concurring); Freedman v. Maryland, 380 U.S. 51, 58–59, 85 S.Ct. 734, 13 L.Ed.2d 649 (1965); Kingsley Books, Inc. v. Brown, 354 U.S. 436, 441–443, 77 S.Ct. 1325, 1 L.Ed.2d 1469 (1957); Near v. Minnesota, 283 U.S. 697, 713–715, 51 S.Ct. 625, 75 L.Ed. 1357 (1931). *Bantam Books, supra,* upon which plaintiffs rely, reminds us specifically that procedures short of prosecution, intended as potential substitutes, may be less acceptable than the standard proceeding that begins with complaint, information or indictment as the first, non-adversary determination.

At any rate, we find no warrant in the First Amendment or the cases that give it full meaning for compelling the radical change plaintiffs seek in state (and, presumably, federal) criminal procedures affecting obscenity cases.

IV.

Plaintiffs New York Feed Company and Stephen Heller make the contention (not made by the *Milky Way* plaintiffs) that N.Y.Penal Law § 235.10 is unconstitutional because it contains the following presumptions:

"1. A person who promotes obscene material, or possesses the same with intent to promote it, in the course of his business is presumed to do so with knowledge of its content and character.

"2. A person who possesses six or more identical or similar obscene articles is presumed to possess them with intent to promote the same."

The argument is made in brief, bland, conclusory terms, merely citing Leary v. United States, 395 U.S. 6, 89 S.Ct. 1532, 23 L.Ed.2d 57 (1969), for the general test of presumptions, but offering no semblance of factual material of the kind essential to such a submission. We do not reach the merits of what may be, on proper submissions in a proper forum, a subject of some interest.

The question tendered under this heading relates to the "rationality"—the sufficient probability—of a posited relationship between one fact (or set of facts) and another. Tot v. United States, 319 U.S. 463, 466–467, 63 S.Ct. 1241, 87 L.Ed. 1519 (1943); United States v. Romano, 382 U.S. 136, 138–139, 86 S.Ct. 279, 15 L.Ed.2d 210 (1965); United States v.

Gainey, 380 U.S. 63, 66–67, 85 S.Ct. 754, 13 L.Ed.2d 658 (1965). The problem is "highly empirical" in its nature. United States v. Gainey, *supra,* 380 U.S. at 67, 85 S.Ct. 754. Its solution entails the exploration of facts which a legislature has either investigated or otherwise learned about, *id.* at 65, 85 S.Ct. 754; Leary v. United States, *supra,* 395 U.S. at 38, 89 S.Ct. 1532, and which judges cannot notice or pretend to know better merely because of their isolated offices. So, for example, in *Leary,* upon which plaintiffs pitch this contention, the Court explored reams of factual material (*id.* at 39–43, 45–52, 89 S.Ct. 1532), and relied upon a district court *record* made before a judge concerned with the same problem. *Id.* at 42, 43, 48, 50, 51, 53, 89 S.Ct. 1532.

Here, plaintiffs merely assume facts, contrary to what the New York Legislature assumed, and announce the latter's irrationality. This does not begin to sustain their position. To mention only one other ally of the Legislature, the American Law Institute, not regularly charged with irrationality, adopted some years ago presumptions which are substantially like the ones here and which very likely are the source of the latter. ALI, Model Penal Code § 251.4(2), Proposed Official Draft, p. 238 (1962); id. § 207.10(5), (7), Tent.Draft No. 6 at 3–4 (1957); see N.Y.Penal Law § 325.-10, Practice Commentary (McKinney's 1967.)

■ The decisive point for our purposes is that the question is not a suitable one for federal declaratory relief when it is open in state proceedings which have been pending for several months. This is not a clear, unalloyed, "pure" question of law like vagueness or overbreadth. It is not a question on which there is no possibility "of a construction by the state courts that would avoid or modify the constitutional question." Zwickler v. Koota, *supra,* 389 U.S. at 249, 88 S.Ct. at 396. It is, instead, a question on which factual investigation may serve as a basis for judicial interpretations and definitions which are proper for state judges, not for us. Cf. Richardson v. Dudley, 295 F.Supp. 181, 184–185 (S.D.N.Y. 1969). Depending upon what the facts reveal (for example about the practices of newsdealers in selecting items for sale), the state courts might conclude that the presumption of knowledge applies only to specified classes of those who deal in allegedly obscene things, not to all who might be thought within the literal reach of the naked statutory text. This seems, in short, to be a clear occasion for abstention, and we follow that still open and appropriate, if lately somewhat straitened, course.

## V.

■ The views expressed thus far imply an obvious prediction that plaintiffs have only a faint hope of prevailing in any aspect of their claims. We recognize, moreover, that these cases are probable additions to those that wither and die before trial unless plaintiffs prevail in their motions for preliminary relief. These considerations do not lead us, however, to the granting of defendants' motions to dismiss. There remain broad, if unpromising, allegations of bad faith. There are charges of threats and harassment which, however empty they seem thus far, are not destroyed on the papers before us. And the alleged waves of arrests, while they too remain largely unsupported as of now, are conceivably capable of more effective proof. Given the liberality with which we must construe complaints assailed by Rule 12 motions to dismiss, we conclude that the sound course is to deny the motions.

To summarize: plaintiffs' motions are in all respects denied upon the foregoing findings and conclusions pursuant to Fed.R.Civ.P. 52(a). The motions to dismiss are also denied. The purposes for which this three-judge court was convened having been accomplished, the court is hereby dissolved.

It is so ordered.