Norman G. MOORE et al., Appellants,

v.

The STATE of Texas, Appellee.

No. 14903.

Court of Civil Appeals of Texas,
San Antonio.

June 30, 1971.

As Modified on Denial of Rehearing
July 28, 1971.

Concurring Opinion July 28, 1971.

Second Rehearing Denied Sept. 1, 1971.

Ausburn & Hibler, San Antonio, for appellants.

Ted Butler, Dist. Atty., R. Emmett Cater, Donald H. Smith, Asst. Dist. Attys., San Antonio, for appellee.

KLINGEMAN, Justice.

An obscenity case. This is an appeal from an order of the trial court granting a temporary injunction enjoining the sale of certain specific magazines, books and items [hereinafter called "Specific Title Order"], and also enjoining the sale of similar magazines, books and items [hereinafter called "Similar Items Order"].

Appellants assert five points of error, two of which attack the Specific Title Order, two the Similar Items Order, and one attacks the constitutionality of the statute under which this proceeding was brought. Although appellants' points of error to some extent overlap, we will attempt in this opinion, insofar as applicable, to discuss the two orders separately.

We are guided by certain well established rules in the character of appellate review required in passing upon the granting of a temporary injunction. To warrant the issuance of a writ of temporary injunction, the applicant need only show a probable right and a probable injury;

he is not required to establish that he will finally prevail in the litigation. Transport Company of Texas v. Robertson Transports, 152 Tex. 551, 261 S.W.2d 549 (1953); Ramey v. Combined American Ins. Co., 359 S.W.2d 523 (Tex.Civ.App.—San Antonio 1962, no writ); Cargill v. Buie, 343 S.W. 2d 746 (Tex.Civ.App.—Texarkana 1961, writ ref'd n. r. e.). It is also well settled that our review is limited to the narrow question of whether the action of the trial court in granting or denying a temporary injunction constitutes a clear abuse of the discretion. Janus Films, Inc. v. City of Fort Worth, 163 Tex. 616, 358 S.W.2d 589 (1962); Texas Foundaries, Inc. v. International Molders & Foundry Workers' Union, 151 Tex. 239, 248 S.W.2d 460 (1952); Briscoe Ranches, Inc. v. Eagle Pass Ind. School Dist., 439 S.W.2d 118 (Tex.Civ.App.—San Antonio 1969, writ ref'd n. r. e.).

Obscenity is not within the area of constitutionally protected speech and press. Roth v. United States, 354 U.S. 476, 77 S.Ct. 1304, 1 L.Ed.2d 1498, 1507; United States v. Reidel, 402 U.S. 351, 91 S.Ct. 1410, 28 L.Ed.2d 813. In *Roth* it was held that a material is obscene and not constitutionally protected against regulation and proscription if "to the average person, applying contemporary community standards, the dominant theme of the material taken as a whole appeals to prurient interest." [1]

Some later cases of the Supreme Court have stated that under this definition three elements must coalesce, and it must be established that:

(a) The dominant theme of the material taken as a whole appeals to a prurient interest in sex;

(b) The material is patently offensive because it affronts contemporary community standards relating to the description or representation of sexual matters; and

(c) The material is utterly without redeeming social value.[2]

Redrup v. New York, 386 U.S. 767, 87 S.Ct. 1414, 18 L.Ed.2d 515; A Book Named "John Cleland's Memoirs of a Woman of Pleasure" v. Attorney General, 383 U.S. 413, 86 S.Ct. 975, 16 L.Ed.2d 1, 5 and 6.

### Constitutionality of Statute

By their fifth point of error appellants assert that the trial court erred in granting the temporary injunctions because Article 527 of the Vernon's Ann. Texas Penal Code is unconstitutional under Article 1, Sections 8 and 19 of the Texas Constitution, Vernon's Ann.St., and the First and Fourteenth Amendments of the United States Constitution. Since this point is common to both the Specific Title Order and the Similar Items Order, we will first discuss it. Article 527 of the Texas Penal

1. The Court equates material which deals with sex in a manner appealing to prurient interests as material having a tendency to excite lustful thoughts, and quotes a dictionary definition of "prurient" as follows: " ' * * * Itching; longing; uneasy with desire or longing; of persons, having itching, morbid, or lascivious longings; of desire, curiosity, or propensity, lewd * * *.' " Roth v. United States, 354 U.S. 476, 487, Footnote 20, 77 S.Ct. 1304, 1310, 1 L.Ed.2d 1498, 1508. In such footnote the Court further said: "We perceive no significant difference between the meaning of obscenity developed in the case law and the

definition of the A.L.I., Model Penal Code, § 207.10(2) (Tent. Draft No. 6, 1957), viz.:

" ' * * * A thing is obscene if, considered as a whole, its predominant appeal is to prurient interest, i. e., a shameful or morbid interest in nudity, sex, or excretion, and if it goes substantially beyond customary limits of candor in description or representation of such matters * * *.' "

2. All justices do not agree on the three elements above. See dissent of Justice Clark in A Book Named "John Cleland's Memoirs of a Woman of Pleasure" v. Attorney General, supra.

Code, as amended in June of 1969, has been held to be constitutional in all aspects involved in this case [3] by a three-judge federal court in Newman v. Conover, 313 F. Supp. 623 (N.D.Texas, 1970), and by the Supreme Court of Texas in State v. Scott, 460 S.W.2d 103 (1970). The contentions made in such two cases as to the unconstitutionality of said statute are basically similar to appellants' contentions herein in this regard.

The proceedings before us were brought pursuant to Section 13 [4] of Article 527, and this section was expressly held to be constitutional in both of the cases above cited. We do not regard Article 527 unconstitutional insofar as any issue involved in the case before us is concerned, and appellants' fifth point of error is overruled.

### Specific Title Order

■ Appellants, by their third and fourth points of error, attack the Specific Title

Order, asserting that there is no evidence upon which to base a finding of obscenity of the specific titles and items enumerated therein, and that there is insufficient evidence upon which to base a finding of obscenity of the specific titles and items enumerated therein.

In passing upon appellants' points of error, we have carefully examined and reviewed the entire record. Included in such record are some 491 exhibits, including some 170 magazines, a newspaper-type publication, some 307 paperback books, with suggestive titles,[5] 10 reels of motion picture film, one deck of cards, and one simulated male penis.

A number of witnesses testified. There was evidenec that on one occasion a student, sixteen years of age, had been in the store for approximately forty minutes at the same time a police officer was there; that the minor was shown some of the items therein including both a simulated male

---

3. The Court in Newman v. Conover, supra, held Sections 1 [F], 3 and 13 constitutional, but held Section 9 unconstitutional. The Supreme Court of Texas in State v. Scott, supra, stated that they agreed with the holding that Sections 1 [F] and 13 are constitutional, but reserved judgment as to the constitutionality of Sections 3 and 9.

4. Section 13: "The district courts of this state and the judges thereof shall have full power, authority, and jurisdiction, upon application by any district or county attorney within their respective jurisdictions, or the attorney general to issue any and all proper restraining orders, temporary and permanent injunctions, and any other writs and processes appropriate to carry out and enforce the provisions of this article. Such restraining orders or injunctions may issue to prevent any person from violating any of the provisions of this article. However, no restraining order or injunction shall issue except upon notice to the person sought to be enjoined. Such person shall be entitled to a trial of the issues within one day after joinder of issue and a decision shall be rendered by the court within two days of the conclusion of the trial. In the event that a final order or judgment of injunction be entered against the person sought to be enjoined, such final order or

judgment shall contain a provision directing the person to surrender to the sheriff of the county in which the action was brought any obscene matter in his possession and such sheriff shall be directed to seize and destroy such matter."

5. *The Blow Job; Swap Ass; Horny and Hung; Prissy Prune; Pink Pussette; Operation Poontang; Hot and Hard; Kiss My Assets; Cherry Gash; Suck It to Me; Virgin Balls; Love Me, Fix Me; Men and Their Boy-Studs; Mass Orgasm; Top C.O.C.K. Comes Again; Free Pussey; Sounds from a Perverted Couch; The Sin-Teen Job; Two Way Bride; Use Me, Hurt Me; Broads Who Want To; Hot Rocks; Turn Down the Sheets; Cooktail; My Body, Your Bed; Oral Genital Relations; Derelict Whore; Hard Way In; From Oral to Anal; The Virgin Trapper; Sex Torture; To Make a Nympho Cry; Swap Meat; The Sister Lovers; Masturbation Fantasies; The Gay Girls; Sexy Spread; Cream Her Kitty; Young Hot Stuff; Licked but Never Beaten; Mouthful of Flesh; A Hot Place to Come; Come as You Are; Incest Confidential; Split Me Open; Come Gay; The Glorious Hole; Naked Place; Hot Flicks; Groovy Nudist; Pussycat; Phallic Development, Its Variations and Extremes; Nude Exploration; Screw.*

and female organ and a "French tickler"; that the prices of some of such items were discussed with him; and that he also looked at some of the magazines. There was testimony of an officer that on one occasion while he was in the store, he asked the identification and ages of three of the customers therein, all of whom were under twenty-one. A picture of the front of such store was introduced into evidence, and shown thereon there is a sign on the door: "Notice—If seeing parts of the nude body tends to offend you, do not enter." There is testimony that the magazines and books therein ranged in price from $3.00 to $6.00, and testimony of sales to some of the customers. A captain of the vice squad testified that he had looked at some of the movie films in the store and browsed through the books and that they were about the worst he had ever seen in any book store and on public display; that in his opinion they definitely did appeal to a prurient interest; and that he did not feel there was any socially redeeming value in such material. A newspaper reporter testified that he had viewed some of the movies and had looked at most of the magazines and books, and that they were obscene; that generally the dominant theme taken as a whole appealed to the prurient interest; that they were utterly without redeeming social value and are patently offensive because they affront contemporary community standards relating to the description or representation of sexual matters.

The trial judge had all of the exhibits before him and after hearing the evidence and examining the exhibits, found that the exhibits 1 through 8 and 12 through 489 were obscene within the definition of Article 527 of the Texas Penal Code; that the dominant theme of the material and matter, when taken as a whole, appeals to a prurient interest in sex; that the material is patently offensive because it affronts contem-

porary community standards relating to the description or representation of sexual matters on a local, state and national scope; and that the matter is utterly without any socially redeeming value. The court further found that each and all of the exhibits exemplified and are hard-core pornography, and that they are filthy, base, degrading, and that they exceed all bounds of propriety and common decency. The court further found that there was evidence of pandering[6] on the part of agents, service and employees of the defendant; that the material is designed not to deal with sex in a manner to advocate ideas or in a way that has any literary, scientific or artistic value, but that sex is used throughout the material solely to pander sex for profit.

We have carefully examined and reviewed the entire record, including the exhibits. The basic contents of the magazines are photographic depictions of nudity, including unclothed human male and female genitalia in close proximity, and acts of sexual perversion. The books consist of detailed verbal descriptions in coarse and vulgar language of acts of masturbation, homosexuality, sodomy, bestiality, sexual intercourse, sadism and masochism. Pictures and descriptions run the gamut of sexual experiences such as lesbianism, female masturbation, homosexuality, the flagellation of male by female, and vice versa, bizarre descriptions of different acts of sexual intercourse between male and female characters. None of the enjoined films purport to portray any story whatsoever, but rather each consists of simulated or suggested abnormal sexual acts between woman and woman, man and man, or multiple groups of same. Most of the action was filmed with the camera in close proximity to the genitals.

We agree with the trial court's findings. The trial court did not abuse its discretion in granting that part of the temporary in-

---

6. Pandering has been defined as the business of purveying textual or graphic material openly advertised to appeal to the erotic interest of customers. Roth v. United States, 354 U.S. at 495–496, 77 S.Ct. 1304, supra; Ginzburg v. United States, 383 U.S. 463, 86 S.Ct. 942, 16 L.Ed.2d 31, 36.

junction herein referred to as "Specific Title Order."

### Similar Items Order

By their first point of error appellants contend that the trial court erred in granting a temporary injunction and entering a Similar Items Order because:

(a) There is no pleading or proof for such relief.[7]

(b) Such order is not specific in terms.

(c) Such order does not describe in reasonable detail the act or acts sought to be restrained.

(d) Such order makes reference to other documents to describe the act or acts sought to be restrained.

The Specific Title Order specifically identifies by title the books, magazines and films that appellants cannot sell or distribute. However, the Similar Items Order enjoins appellants from selling or distributing any matter or matters of a like nature similar to the exhibits, and any other matters in which the dominant theme of the matter taken as a whole appeals to the prurient interest in sex, and in which the material is patently offensive because it confronts contemporary community standards relating to the description or representation of sexual matters, and the matter is utterly without redeeming social value.

█ Rule 683, Texas Rules of Civil Procedure, provides that every order granting an injunction and every restraining order shall set forth the reasons for its issuance; shall be specific in terms; shall describe in reasonable detail and not by reference to the complaint or other documents the act or acts sought to be restrained.

It is elementary that an injunction must be definite, clear and concise, leaving the person enjoined in no doubt about his duties, and should not be such as would call on him for interpretations, inferences or conclusions. Villalobos v. Holguin, 146 Tex. 474, 208 S.W.2d 871, 875 (1948); Gulf Oil Corp. v. Walton, 317 S.W.2d 260, 264 (Tex.Civ.App.—El Paso 1958, no writ); Lowe & Archer, Texas Practice, Injunction and Other Extraordinary Proceedings, Section 355, pages 369, 370.

█ Only by reference to exhibits 1 through 8 and 12 through 489 can appellants know what they are restrained from doing in the Similar Items Order. Such Similar Items Order violates the provisions of Rule 683, which provide that the act or acts sought to be restrained shall be described in reasonable detail and not by reference to the complaint or other documents. The requirements of Rule 683 are mandatory. Transport Company of Texas v. Robertson Transports, supra; Eastex Wildlife Conservation Ass'n v. Jasper, etc., 450 S.W.2d 904, 918 (Tex.Civ.App.—Beaumont 1970, writ refused, n. r. e.); City of Fort Worth v. McDonald, 293 S.W.2d 256, 260 (Tex.Civ.App.—Fort Worth 1956, writ ref'd n. r. e.); Gonzalez v. Rodriguez, 250 S.W.2d 253 (Tex.Civ.App.—San Antonio 1952, no writ).

We are of the opinion that the portion of the judgment herein described and referred to as the Similar Items Order is overbroad and in violation of the mandatory provisions of Rule 683, T.R.C.P. It does not sufficiently appraise appellants of the acts they are restrained from doing. In effect, the court is passing upon the obscenity of books, magazines, newspaper and films not before it, and perhaps not now in existence; and it prohibits generally the defendants from violating a penal statute.[8] without clear, precise or definite guide lines. We sustain appellants' first point of error.

Club v. State, 307 S.W.2d 627 (Tex.Civ. App.—Amarillo 1957, no writ).

---

7. Appellee's petition specifically identifies the books, magazines and films which were covered in the Specific Title Order, but appellee does not ask to enjoin the sale or distribution of books, magazines or films similar to the books, magazines and films described and referred to in its petition. The relief granted by the court under the Similar Items Order is more extensive than that sought. See Red Devil

8. In addition to the injunctive relief provided for in Article 527, Section 13 of the Texas Penal Code, such statute also provides for punishment for violations of such statute including fines, jail and penitentiary sentences. Article 527, Section 8.

Appellants' second point of error is that the trial court erred in granting a temporary injunction in entering the Similar Items Order because such order constitutes a prior restraint upon freedom of speech and press, and thus violates the First Amendment to the United States Constitution, and Article 1, Section 8 of the Texas Constitution. In view of our disposition of Point of Error No. 1, we do not pass on this constitutional question.

The judgment is reformed so as to eliminate therefrom that portion of the judgment, herein described and referred to as the "Similar Items Order;" and as so reformed, the judgment is affirmed.

CADENA, Justice (dissenting).

I would also set aside that portion of the trial court's order, described by Justice Klingeman as the "Specific Title Order," which proscribes the distribution of nearly 500 books, magazines, films and other items.

For the purposes of this opinion, it will be assumed that the relaxed standard of review which the courts of this State apply in temporary injunction cases may properly be adopted to uphold a temporary injunction which stifles expression.[1] Appellants do not here contend that the Texas practice, which allows the issuance of a temporary injunction if the applicant alleges a

cause of action and produces evidence which "tends" to sustain it, as applied to a case involving freedom of expression, is inconsistent with the holding in United States v. Thirty-Seven (37) Photographs, 402 U.S. 363, 91 S.Ct. 1400, 28 L.Ed.2d 822 (1971), wherein the Supreme Court of the United States held that, in cases involving seizure of materials, judicial action must be instituted within 14 days, and the interval between institution of judicial proceedings and "final decision" of the case may not exceed 60 days.

The attempts by the Supreme Court of the United States to establish standards for the regulation of obscenity have resulted in a myriad of inconsistent opinions[2] which justifies the observation by Mr. Justice Harlan, in dissent: "The central development that emerges from the aftermath of Roth v. United States, 354 U.S. 476, 77 S. Ct. 1304, 1 L.Ed.2d 1498, is that no stable approach to the obscenity problem has yet been devised by this Court." A Book, etc. v. Attorney General of Com. of Mass., 383 U.S. 413, 455, 86 S.Ct. 975, 996, 16 L.Ed.2d 1 (1966).

Despite the lack of a "majority view" among the nine justices, the salient fact is that, absent evidence of "pandering,"[3] or a claim that the statute on which the suppression is based reflects a specific and limited state concern for minors,[4] or a set of circumstances which permit the appeal of the

---

1. Cf. Jacobellis v. State of Ohio (1964), 378 U.S. 184, 190, n. 6, 84 S.Ct. 1676, 1679, 12 L.Ed.2d 793: "Nor do we think our duty of constitutional adjudication in this area can properly be relaxed by reliance on a 'sufficient evidence' standard of review. Even in judicial review of administrative agency determinations, questions of 'constitutional fact' have been held to require *de novo* review."

2. One commentator, who describes the law of obscenity as a "constitutional disaster area," concludes that the decisions yield five different "tests." Magrath, The

Obscenity Cases: Grapes of Roth, 1966 Sup.Ct.Rev. 7, 56–57. Subsequently, with two justices dissenting, the Court agreed with this analysis. Redrup v. State of New York, 386 U.S. 767, 87 S.Ct. 1414, 18 L.Ed.2d 515 (1967).

3. Ginzburg v. United States, 383 U.S. 463, 86 S.Ct. 942, 16 L.Ed.2d 31 (1966).

4. Ginsberg v. State of New York, 390 U.S. 629, 88 S.Ct. 1274, 20 L.Ed.2d 195 (1968). Cf. Butler v. State of Michigan, 352 U.S. 380, 77 S.Ct. 524, 1 L.Ed.2d 412 (1957).

material "to be assessed in terms of the sexual interests of its intended and probable recipient group,"[5] the Court has never held any material to be obscene.

Despite the divergent views of the members of this nation's highest tribunals, the standard which the Texas courts must apply has been formulated by our legislature. Whatever may be the extent of the constitutional power of a state to proscribe material dealing with sex, our legislative branch has chosen to outlaw such material only when (a) the dominant theme of the material, taken as a whole, appeals to a prurient interest; (b) the material is patently offensive because it affronts contemporary community standards relating to the description or representation of sexual matters; and (c) the material is utterly without redeeming social value. Tex.Pen.Code Ann. Article 527, Section 1(A). The Texas standard, then, is that enunciated by Mr. Justice Brennan in A Book, etc. v. Attorney General of Com. of Mass., 383 U.S. 413 at 418, 86 S.Ct. 975.

The majority opinion here does not explicitly deal with the problem of whether or not a finding of obscenity can be sustained in the absence of evidence, other than the allegedly obscene material itself, bearing on the elements prescribed by the statute. Nor has the Supreme Court of the United States given us any guidance on this point.[6] Decisions of state and lower federal courts are not in agreement. In State v. Hoyt, 286 Minn. 92, 174 N.W.2d 700, 702 (1970),

a nearly unanimous Supreme Court of Minnesota said: "In answer to the appellants' assertion that the convictions are unsupported by evidence bearing upon the social value of the books and their acceptance by community standards, we can only say that such evidence would add nothing. The material speaks for itself. If it is not obscene, the word has lost all meaning. We identify it for what it is and hold that it is obscene as a matter of law." The authoritative nature of this pronouncement is somewhat weakened by the fact that the judgment of the Supreme Court of Minnesota was reversed in a three-line opinion by the Supreme Court of the United States. Hoyt v. Minnesota, 399 U.S. 524, 90 S.Ct. 2241, 26 L.Ed.2d 782 (1970).

A leading decision expressing a view contrary to that adopted by the Minnesota court is Dunn v. Maryland State Board of Censors, 240 Md. 249, 213 A.2d 751 (1965), where the Maryland court held that neither the trial court nor the appellate court was qualified to determine whether the material was obscene, pointing out that, except in rare cases, obscenity cannot be established without competent testimony in addition to the material itself. To the same effect are United States v. Klaw, 350 F.2d 155 (2d Cir. 1965); City of Phoenix v. Fine, 4 Ariz.App. 303, 420 P.2d 26 (1966); In re Giannini, 69 Cal.2d 563, 72 Cal.Rptr. 655, 446 P.2d 535 (1968); Ramirez v. State, 430 P.2d 826 (Okl.Cr.1967); and In re Seven Magazines, 268 A.2d 707 (Sup.Ct. R.I.1970).

5. Mishkin v. State of New York, 383 U.S. 502, 86 S.Ct. 958, 16 L.Ed.2d 56 (1966).

6. Mr. Justice Brennan believes that a jury "has a special aptitude for reflecting the view of the average person" and "for judging obscenity which, by its definition, calls for an appraisal of material according to the average person's application of contemporary community standards." But he apparently is not convinced that a judge has such special aptitude, since he does not believe that a statute which does not afford the defendant "of right" a jury trial on the issue of obscenity can be

valid. See his dissenting opinion in Kingsley Books, Inc. v. Brown, 354 U.S. 436, 448, 77 S.Ct. 1325, 1331, 1 L.Ed. 2d 1469 (1957).

Mr. Justice Harlan, dissenting in part in Smith v. People of State of California, 361 U.S. 147, 171, 80 S.Ct. 215, 4 L.Ed.2d 205 (1960), while stating that it was error for the trial court to exclude evidence of contemporary community standards, expressed the view that opinion testimony of experts was not necessary and that obscenity could be established by other means.

I agree with the view expressed by Justice Otis in his dissenting opinion in State v. Hoyt, 286 Minn. 92, 174 N.W.2d 700, 707 (1970), reversed, sub nom. Hoyt v. Minnesota, 399 U.S. 524, 90 S.Ct. 2241, 26 L.Ed.2d 782:

"I am impressed by the reasoning of cases which require a more thoughtful consideration of the elements of obscenity than is permitted by reliance on the subjective reaction of the factfinder. While it may be argued that in a case tried to a court wtihout a jury there is a presumption that in arriving at a decision the judge will have in mind all of the elements of the offense, in this area of judicial responsibility he has no particular expertise on which to draw. In effect, he is called on to take judicial notice of whether the dominant theme of the material appeals to a prurient interest in sex; whether it affronts contemporary community standards relative to sex; and whether it is utterly without redeeming social value. In my opinion, neither judge nor jury is qualified to make such findings of fact so as to deprive a defendant of First Amendment protection without more evidence than the material itself."

Mr. Justice Frankfurter, who steadfastly refused to agree that the freedoms protected by the First Amendment occupied a "preferred" position, pointed out, in the course of his concurring opinion in Smith v. People of State of California, 361 U.S. 147, 165, 80 S.Ct. 215, 225, 4 L.Ed.2d 205 (1960), that:

" * * * community standards or the psychological or physiological consequences of questioned literature can as a matter of fact hardly be established except through experts * * *. Of course the testimony of experts would not displace judge or jury in determining the ultimate question whether the particular book is obscene, any more than the testimony of experts relating to the state of the art in patent suits determines the patentability of a controverted device.

"There is no external measuring rod for obscenity. Neither, on the other hand, is its ascertainment a merely subjective reflection of the taste or moral outlook of individual jurors or individual judges. Since the law through its functionaries is 'applying contemporary community standards' in determining what constitutes obscenity * * * it surely must be deemed rational, and therefore relevant to the issue of obscenity, to allow light to be shed on what those 'contemporary community standards' are. Their interpretation ought not to depend solely on the necessarily limited, hit-or-miss, subjective view of what they are believed to be by the individual juror or [sic] judge."

If this conclusion is correct, the record before us does not support the suppression of the nearly 500 items to which the "Specific Title Order" applies.

Only two witnesses testified concerning the obscene nature of the materials. The first was a police officer who had been a member of the vice squad of the San Antonio Police Department for almost twenty years. At the time that he testified only the first eight exhibits had been admitted in evidence. The basis for his testimony can best be illustrated by setting out in full the district attorney's first question relating to exhibits 1, 2, 3 and 4[7]: "Well, based upon State's Exhibits Numbers 1 through 4, the magazines, based upon your experience as a vice officer since 1951, based upon your experience and many times what was successfully prosecuted as pornography, have you formed an opinion as to

7. These exhibits were four magazines entitled *Wild Couples; Phallic Development, Its Variations and Extremes; Bottoms Up;* and *A Study of Sado-Masochism.*

whether or not these objects appeal to a prurient interest?"

This officer did not read the four magazines, but merely "browsed" through them, looking only at the pictures. He testified that all four magazines appealed to a prurient interest, were patently offensive, and lacked social redeeming value. Neither this, nor any other witness, testified that two paperback books identified as exhibit 5 (*Kiss My Assets*) and exhibit 6 *(Cherry Gash)*, are obscene.

With reference to exhibit 7 (a deck of cards bearing pictures of a nude male and a nude female) and exhibit 8 (described in the trial court's order as a rubber article "which resembles a penis" and in Justice Klingeman's opinion as a "simulated male penis"), the officer testified that these two articles "appeal to a prurient interest, *or* confront [sic] the contemporary community standards, and are without redeeming social value." (Emphasis mine.) There is no testimony from any witness to the effect that, with reference to these two exhibits, all three elements of the statutory definition coalesced. Under our statute, material is not obscene unless it appeals to a prurient interest, *and* is patently offensive *and* is without redeeming social value. There is, therefore, no oral testimony that either exhibit 7 or exhibit 8 is obscene.

Exhibits 9, 10 and 11 do not consist of allegedly obscene material.

The only other witness who testified concerning the nature of the material was a newspaper reporter whose primary "beat" at the time of the hearing was the Bexar County Court House. His testimony compels the conclusion that he had only seen exhibits 13 through 486. There is, therefore, no oral testimony relating to the obscenity *vel non* of exhibits 12, 487, 488 and 489. The only testimony concerning the qualifications of this witness to testify concerning the elements of obscenity is to

the effect that he had been a newspaper reporter for several years; that because of his avocation he met more people, "from pillheads to college professors," than does the average person; and that he had known some sexual deviates.

This newspaper reporter was asked questions concerning more than 160 magazines, more than 300 paperback books, and 10 reels of film. He saw these materials for the first time about 24 hours before he began his testimony. It is not surprising, then, that he testified that he found it a physical impossibility to read all of the books, and that he had only viewed five of the films.

His testimony clearly reveals the nature of his examination of the exhibits. In answer to an inquiry concerning the number of the exhibits which he had "seen," he answered, "Seen and handled—Handled; let's do it that way. Some of these I paid very little attention to, but handled, I would say—95 to 98 per cent—maybe 99 per cent." He had "looked at" the exhibits the previous afternoon during a recess taken for the purpose of permitting the court reporter to place identifying numbers on more than 475 exhibits. With few exceptions, he could identify the exhibits only by the numbers placed on them by the court reporter. He testified that he could not say that all of the magazines appealed to a prurient interest. With reference to the magazines he had "looked at," he testified, "Speaking generally, again, using kind of a majority yardstick concerning the majority of the magazines that I saw, I would say [that they are obscene]." He did not identify the magazines which he had "seen" as distinguished from those which he had merely "handled" and those which he had not seen or handled. He did not identify the magazines which constituted the "majority" which he labeled obscene. He testified categorically that "some" of the magazines were obscene and that "some" were not obscene, without

specifically identifying any one magazine as being in one or the other of the two categories.

Concerning the paperback books, the newspaper reporter, again said that "some" are obscene and "some" are not obscene. Again, with the exception of the two specific books discussed in the next succeeding paragraph, he does not identify the specific titles which he considers obscene or the specific titles which he considers not to be obscene.

This witness gave specific testimony concerning only two of the paperback books, testifying that exhibit 394 (entitled *Box Buster*) and exhibit 445 (entitled *Come As You Are*) are obscene.

He had viewed five films. He said that of these five three are obscene (exhibits 286, 292 and 293) and one (exhibit 287) is not obscene. He expressed no opinion concerning the fifth film (exhibit 289) which he had viewed.

The most that can be said for the testimony of these two witnesses is that they testified that exhibits 1, 2, 3, 4 (magazines), 286, 292, 293 (films), 394 and 445 (paperback books) are, in the opinion of one or the other of the two witnesses, obscene. As has already been pointed out, no one testified concerning exhibits 4 and 5, and the testimony of the police officer concerning exhibits 7 and 8 fails to show a coalescence of the three required elements. The obscenity *vel non* of exhibits 9, 10 and 11 is not in issue. There is no testimony concerning exhibits 487, 488 and 489.

*Exhibits 13 Through 486*

Except for the two books (exhibits 394 and 445) and the three films (exhibits 286, 292 and 293), no one testified that any one of the exhibits numbered 13 through 486 is obscene.

(a) *The Books.* Giving to the testimony of the newspaper reporter its maximum possible effect, it amounts to no more than statements to the effect that "some" of the books are obscene and that "some" are not. It is difficult to understand the mental processes by which testimony that "some" of the books are obscene and that "some" are not is converted into the finding that all of the books are obscene.

In addition, I am not prepared to believe that a person can determine whether a book is obscene merely by "handling" it.

(b) *The Magazines.* Again, the newspaper reporter did not say that any specific magazine is obscene. His testimony was limited to the expression of the opinion that "some" or a majority of the magazines are obscene and that "some" are not. To repeat, the two propositions, "Some A is B" and "Some A is not B" cannot, by any rule of any system of logic, yield the conclusion "All A is B."

(c) *The Films.* The police officer did not testify that any of the films included in the court's order could be regarded as obscene. He did say that he had viewed ten films at appellants' place of business. But at the time he testified the ten suppressed films had not been introduced in evidence or even marked as exhibits. There is no testimony tending to indicate that the ten films which the police officer viewed are the ten films which the trial court suppressed. In fact, his description of the films which he viewed compels the conclusion that they are not the films introduced in evidence.

The newspaper reporter, of course, expressed no opinion concerning the five films which he did not view. Of the five films which he viewed, only three are, in his opinion, obscene. He stated one was not obscene and expressed no opinion concerning the other.

There is, therefore, no testimony concerning six of the ten films.

*Exhibits 1, 2, 3, 4, 286, 292, 293, 394 and 445*

These are the only exhibits which the witnesses specifically said were obscene. I find nothing in the record which furnishes any support for the conclusion that the witnesses were qualified to express opinions on the subject.

An answer to the question of whether material appeals to the prurient interest of the average person, if the answer is to be given any weight, must be based on a knowledge of obviously complex psychological factors and physiological reaction to stimuli. It is naive to pretend that laymen possess such knowledge.[8]

Even if the necessary prurient appeal is present, material is not to be anathematized, under our statute, unless it is also "patently offensive because it affronts contemporary community standards relating to the description or representation of sexual material." There is no evidence that either witness possessed any knowledge concerning community standards relating to the description or representation of sexual material. Neither witness testified that he had any special knowledge concerning the mores of any community, local, state or national, with respect to such description or representation.

It is no disrespect to our police officers to insist that in the sensitive area of freedom of expression "decisions be made according to a more rigorous standard employed by more expertly trained hands," than standards fixed by members of the vice squad. Poulos v. Rucker, 288 F.Supp. 305, 309 (M.D.Ala.N.D.1968).

The newspaper reporter, while claiming some knowledge of what would appeal to the prurient interest of a sexual deviate, claimed no such knowledge with reference

---

8. "Of all the presumed consequences of exposure to erotic stimuli, the effect of sexual excitement is probably the most widely held and commonly mentioned. In the national survey conducted for the Commission (Abelson et al., 1970) 72% of adult males and 63% of adult females indicated that they believed that 'sexual materials excite people sexually,' although considerably fewer reported experiencing this effect themselves. The growing body of research which bears on this question shows, in general, that photographs, stories, and films which depict various aspects of human sexuality produce excitement in a large proportion of the population. Available knowledge in this area, however, continues to be complicated by certain technical problems in the measurement and interpretation of physiological and psychological responses to sexual stimulation * * *.

"Human sexual arousal is apparently manifested by a wide range of somatic, psychological, and behavioral responses. Hence, sexual arousal may be associated with physiological changes, in, for example, blood volume, temperature, muscle tension, respiration, and pupil dilation. Changes in these parameters may also oc-cur, however, with the arousal associated with other emotions, such as fear, anger, disgust, etc., and hence are not specific to sexual arousal. The nonspecificity of physiological responses to sexual stimulation is thus a methodological problem in this area * * *.

"What proportion of the general population is aroused sexually by erotic materials is difficult to assess * * *. Thus Kinsey (et al., 1948, 1953) employing an intensive 'clinical' interview with repetitive questioning * * * found that 77% of males and 32% of females *reported* having been at some time sexually aroused by 'photographs, drawings, motion pictures and other portrayals of sexual action.' In considerable contrast Abelson, et al., (1970), asked a national probability sample whether they believed various alleged effects of sexual materials actually occurred and whether they had experienced such effects personally. Twenty-three percent of the males and 8% of the females reported that they had at some time been sexually excited by sexual matters * * *." The Report of the Commission on Obscenity and Pornography 164, 166 (1970).

to an average person. It is, I think, interesting to note that, after stating that some of the materials appeal to a prurient interest of the average person, and after describing himself as a normal male with normal male drives and urges, he insisted that none of the material appealed to his prurient interest. While he said he understood the meaning of the phrase "contemporary community standards," he did not say that he knew what those standards are. Despite his wide acquaintance with all types of persons, there is nothing to indicate that he and his acquaintances, be they professors or pillheads, ever exchanged views about, or discussed, contemporary community standards relating to the representation or description of sexual material.

"What is pornography for one man is the laughter of genius to another." Lawrence, Pornography and Obscenity, printed in *Sex Literature and Censorship* 69 (Moore ed.1953). I am not ready to accept the notion that police officers, newspaper reporters, or judges are, *ex officio*, qualified to distinguish, on the basis of our statutory standard, between the chuckle of the genius and the lascivious smirk of the pornographer.

Even if it be conceded that laymen are competent to determine what is obscene under our statute, or that trial judges may make the necessary fact finding on the basis of the materials themselves, the injunction here cannot stand.

With reference to the paperback books, the following synopsis of the book popularly referred to as *Fanny Hill* is relevant:

"*Memoirs* is nothing more than a series of minutely and vividly described sexual episodes. The book starts with Fanny Hill, a young 15-year-old girl, arriving in London to seek household work. She goes to an employment office where through happenstance she meets the mistress of a bawdy house. This takes 10 pages. The remaining 200 pages of the book detail her initiation into various sexual experiences, from a lesbian encounter with a sister prostitute to all sorts and types of sexual debauchery in bawdy houses and as the mistress of a variety of men. This is presented to the reader through an uninterrupted succession of descriptions by Fanny, either as an observer or participant, of sexual adventures so vile that one of the male expert witnesses in the case was hesitant to repeat one of them in the courtroom. These scenes run the gamut of possible sexual experience such as lesbianism, female masturbation, homosexuality between young boys, the destruction of a maidenhead with consequent gory descriptions, the seduction of a young virgin boy, the flagellation of male by female, and vice versa, followed by fervid sexual engagement, and other abhorrent acts, including over two dozen separate bizarre descriptions of different sexual intercourses between male and female characters. In one sequence four girls in a bawdy house are required in the presence of one another to relate the lurid details of their loss of virginity and their glorification of it. This is followed the same evening by 'publick trials' in which each of the four girls engages in sexual intercourse with a different man while the others witness, with Fanny giving a detailed description of the movement and reaction of each couple.

"In each of the sexual scenes the exposed bodies of the participants are described in minute and individual detail. The pubic hair is often used for a background to the most vivid and precise descriptions of the response, condition, size, shape, and color of the sexual organs before, during and after orgasms. There are some short transitory passages between the various sexual episodes, but for the most part they only set the scene and identify the participants for the next

orgy, or make smutty references and comparison to past episodes.

"There can be no doubt that the whole purpose of the book is to arouse the prurient interest. Likewise the repetition of sexual episode after episode and the candor with which they are described renders the book 'patently offensive.'"

The above description is taken from the dissenting opinion of Mr. Justice Clark in A Book, etc. v. Attorney General of Com. of Mass., 383 U.S. 413, 445–446, 86 S.Ct. 975, 991, 16 L.Ed.2d 1 (1966), and expresses his displeasure with the holding that the book is not obscene. With irrelevant changes in the names of characters and of locale, Mr. Justice Clark's review of *Fanny Hill* is an accurate description of the worst of the paperback books involved in this case.

One of the books which the trial court declared obscene in this case is *Business As Usual* (exhibit 150). This is one of the books which the Supreme Court of Minnesota held to be obscene in Hoyt v. State, supra, with the observation that the book spoke for itself and that the court had no difficulty recognizing the book for what it is. Whatever criticism may be directed at the *per curiam* opinion reversing this holding, Hoyt v. Minnesota, 399 U.S. 524, 90 S.Ct. 2241, 26 L.Ed.2d 782 (1970), it is clear that a majority of the members of the United States Supreme Court agreed that the book, judged by the *res ipsa loquitur* approach adopted by the Minnesota Court, is not obscene. Today this Court, purportedly applying the same constitution which the Supreme Court of the United States was expounding in *Hoyt*, declares the book obscene, and this declaration is based on the same evidence, the book itself, standing alone, which the Minnesota Court incorrectly interpreted.

In Times Film Corporation v. City of Chicago, 244 F.2d 432, 436 (7th Cir. 1957),

the opinion declaring the film, "The Game of Love," obscene, described the film as follows:

"The film, as an exhibit in this case, was projected before and viewed by us. We found that, from beginning to end, the thread of the story is supercharged with a current of lewdness generated by a series of illicit sexual intimacies and acts. In the introductory scenes a flying start is made when a 16 year old boy is shown completely nude on a bathing beach in the presence of a group of younger girls. On that plane the narrative proceeds to reveal the seduction of this boy by a physically attractive woman old enough to be his mother. Under the influence of this experience and an arrangement to repeat it, the boy thereupon engages in sexual relations with a girl of his own age. The erotic thread of the story is carried, without deviation toward any wholesome idea, through scene after scene. The narrative is graphically pictured, with nothing omitted except those sexual consummations which are plainly suggested * * *."

Nine of the films before us can, with complete accuracy, be similarly described, except for insignificant changes concerning the cast of characters and locale. The Seventh Circuit's judgment holding the film obscene was summarily reversed by the Supreme Court of the United States. Times Film Corp. v. City of Chicago, 355 U.S. 35, 78 S.Ct. 115, 2 L.Ed.2d 72 (1957). It may be significant that the decision thus summarily reversed contained the following observation: "The ordinary person knows what is obscene and immoral. That knowledge is a workable basis for regulation of such matters * * *." 244 F.2d at 435.

The other film in the record shows nude men. Neither of the episodes of this film "is supercharged with a current of lewd-

ness generated by a series of illicit sexual intimacies and acts," as is the judicially tolerated film, "The Game of Love."

The banned magazines, again, are no worse than the publications which the Supreme Court, in the face of lower court findings of obscenity accompanied by expressions of appropriate judicial shock and disgust, were held not obscene. See the decisions reviewed in the dissenting opinion of Justice Otis in State v. Hoyt, supra, 286 Minn. 92, 174 N.W.2d 700 at 707–709, and the appendix to the opinion of the Rhode Island Supreme Court in In re Seven Magazines, 268 A.2d 707, 713–14.

It may be true, as many believe, that the Supreme Court of the United States has opened the door to filth and degeneracy. Many may doubt the wisdom, and some have questioned the motives and morals, of a court which puts its stamp of approval on publications such as those which our supreme tribunal has declared to be constitutionally protected. But it is unrealistic to consider the validity of the proscriptive order in this case without reference to the facts of the "held-not-to-be-obscene" or "approved" cases.

The fact that judges consider certain materials to be "dismally unpleasant, uncouth and tawdry" is "not enough to make them 'obscene.'" Manual Enterprises, Inc. v. Day, 370 U.S. 478, 490, 82 S.Ct. 1432, 1438, 8 L.Ed.2d 639 (1962). The question before us is not whether the material before us is vulgar, filthy, revolting and disgusting, but whether it is obscene in the constitutional sense. "I personally found '491' repulsive and revolting * * *. Were I to be vested with dictatorial powers, I would ban and destroy the trash (in my opinion) which infests the news kiosks and the movie theatres in certain areas * * *. I would do all this in the vainglorious belief that I was acting as a Beneficent Tyrant for the good of all Mankind. But the very utterance of these thoughts is more than sufficient reason to shy away from censorship except in extreme cases * * *." United States v. One Carton Positive Motion Picture Film Entitled "491," 367 F.2d 899, 897 (2d Cir. 1966).

In this case there is no evidence of the type of "pandering" which was present in Ginzburg v. United States, supra;[9] or a claim that the statute on which the State relies reflects a specific and limited state concern for minors[10] as in Ginsberg v. New York, supra; or evidence of an assault upon individual privacy in a manner so obtrusive as to make it impossible to avoid exposure to the material in question. Redrup v. New York, supra, 386 U.S. 767 at 769, 87 S.Ct. 1414, 18 L.Ed.2d 515.

9. It is true, as the majority opinion asserts, that the trial court found there was evidence of pandering. There is no evidence of such nature. This is, perhaps, best illustrated by the failure of the majority, despite a challenge to the sufficiency of the evidence, to detail, or even refer to in general terms, the evidence which might tend to support this finding. There is no evidence here, such as that on which Mr. Justice Brennan relied on to support his finding of pandering in *Fanny Hill*, of a taste for unusual mailing addresses or of unusual advertising methods. The sign on the door merely warned those who would be offended at sight of nude parts of the human body to refrain from entering cannot be considered pandering. The law is clear that depictions of nude persons does not of itself constitute obscenity. Such a notice merely made it possible for persons to avoid exposure to the material. It would be ironic to hold that steps taken to avoid an assault upon individual privacy in a manner which makes it impossible to avoid exposure to nudity will support a finding of pandering. Such a "heads I win, tails you lose" doctrine is indefensible.

10. Texas has a statute specifically aimed at the distribution of materials "harmful to minors." Tex.Pen.Code Ann., Article 534b. The State does not pretend to be relying on this statute. In any event, an injunction based on Article 534b could constitutionally proscribe only the distribution of materials to minors. Butler v. State of Michigan, 352 U.S. 380, 77 S.Ct. 524, 1 L.Ed.2d 412 (1957).

**406**

BARROW, Chief Justice (concurring).

I fully join in the opinion written by Justice Klingeman holding that the trial court did not abuse its discretion in issuing the temporary injunction enjoining the sale of certain specified magazines, books, films and items. The proceedings were brought pursuant to Article 527, Tex.Pen.Code Ann., as revised in 1969, and this statute has been held to be constitutional.

In view of the quotes by Justice Cadena in his dissenting opinion from prior opinions of the Supreme Court of the United States, including several from dissenting opinions of said Court, I think it well to point out that in United States v. Reidel, 402 U.S. 351, 91 S.Ct. 1410, 28 L.Ed.2d 813, which opinion was delivered on May 3, 1971, six justices upheld the constitutionality of a statute which prohibited the distribution of obscene materials to willing adult recipients. It was there said: "obscenity is not within the area of constitutionally protected speech or press" and there is no "constitutional right in people like Reidel to distribute or sell obscene materials."

Thus, it is seen that the temporary injunction was issued under authority of a constitutional law. Furthermore, the record fully supports the trial court's findings that the enjoined exhibits are obscene materials as defined by this law. The trial court expressly found that such exhibits exemplify and are hard-core pornography. These materials are accurately described in the majority opinion, and if such exhibits are not hard-core pornography, then there is no such thing. It is inconceivable that such materials could be passed off by a court as "the chuckle of the genius."

It is true that there is much confusion in this field, not only among the opinions of various courts and the individual judges thereof, but also among the psychologists and sociologists who have considered this issue. Many urge that adults should have complete freedom to produce, deal in, possess, and consume whatever communicative materials may appeal to them. However, as was recently said by the majority of the Court in *Reidel*, this is a legislative decision and the task of restructuring the obscenity laws lies with those who pass, repeal, and amend statutes and ordinances.

The Texas Legislature in 1969, enacted Article 527, supra, and the record before us fully supports the temporary injunction of the trial court issued under this statute. I concur in the affirmance of the judgment of the trial court as reformed.